1

1          IN THE COURT OF COMMON PLEAS
              OF ERIE COUNTY, PENNSYLVANIA
2

3   DEVELOPERS DIVERSIFIED          )
    REALTY CORPORATION              )
4                    Plaintiff      )
                                    )
5        v.                         )
                                    )
6   ZEMENCO, INC.                   )
                     Defendant      )   NO. 11919-1999
7

8              * * * * * * * * * *

9        Deposition of RICHARD HESSINGER taken at the offices of

10  McClure & Miller, 717 State Street, Suite 701, Erie,

11  Pennsylvania on Monday, January 10, 2000 beginning at 3:00

12  p.m. before Cecelia H. Muhanna, court reporter.

13

14  Appeared on behalf of the Plaintiff:

15       Stanley R. Geary, Esquire, One Oxford Centre, 301 Grant

16       Street, Pittsburgh, PA

17

18

19  Appeared on behalf of the Defendant:

20       Eugene J. Brew, Jr., Esquire, 717 State Street, Suite

21       701, Erie, PA

22

23       ORIGINAL

24       Exhibit
         ZZZZ

25

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Appeared on behalf of Summit Township:

2       Timothy M. Sennett, Esquire, 120 West Tenth Street,

3       Erie,PA

4

5

6   Appeared on behalf of Mr. Hessinger:

7       Edward J. Betza, Esquire, 150 East Eighth Street, Erie,

8       PA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3

1

2                            I N D E X

3   DEPONENT:  RICHARD HESSINGER

4   examination by

5    Mr. Brew          p. 4

6

7

    DEPOSITION
8   EXHIBITS      DESCRIPTION                    MARKED

9    1            notice of deposition          p. 6

10   2            subpoena                       p. 6

11   3            agreement between DDRC and Summit  p. 7

12   4            agreement between DDRC and Summit  p. 7

13

14

15

16

17

18

19

20

21

22

23

24

25

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1

2          MR. BREW:  Could we clarify first Mr. Tim

3   Sennett's presence?  Is he representing you at

4   this point?

5          MR. HESSINGER:  No.

6          MR. BREW:  I mean have you asked that he

7   be here?

8          MR. HESSINGER:  Originally he was going to

9   represent me, but basically he represents the

10  township.  So then I talked with Ed Betza; I

11  thought it would be better to have a personal

12  attorney, and so then I told Ed to talk to Tim

13  and decide what they wanted to do about that,

14  so I guess it's a little complicated.

15         MR. BREW:  Okay, but if he's here with

16  your consent or wishes, then, that's fine.

17         MR. HESSINGER:  I don't have any problem

18  with him being here, but I would say --

19         MR. BREW:  But he's not representing you

20  personally then?

21         MR. HESSINGER:  No, he's representing

22  Summit Township.

23         MR. BREW:  Okay, fine.

24              * * * * * * * * *

25

1                    RICHARD HESSINGER, first being

2                    duly sworn, testified as follows:

3 EXAMINATION BY MR. BREW:

4      Q.     Can you give us your full name first, Richard?

5      A.     Richard Paul Hessinger.

6      Q.     What's your present address, business or

7 personal?

8      A.     My home address is 2330 Dorn Road, D-o-r-n,

9 Waterford, PA 16441.

10     Q.     And what's your present business or occupation?

11     A.     I'm a teacher for Millcreek School District.

12     Q.     Were you at one time a Summit Township

13 supervisor?

14     A.     Yes.

15     Q.     Elected supervisor?

16     A.     For eighteen years.  I just left office December

17 31, 1999.

18     Q.     So you were a supervisor for eighteen

19 consecutive years?

20     A.     No, it was twelve consecutive years.  There was

21 two years in between my first term and second term.

22     Q.     Do you know the dates or the years that you

23 served?

24     A.     1980 to 1985 and 1988 to 1999.

25     Q.     Okay, from '88 to '99 did you have any

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1 particular assignment at Summit such as roads, water, sewer,

2 things like that?

3     A.    From 1988 and 1989 I was roadmaster.  1990 to

4 the end of 1995 I was secretary-treasurer, and then from

5 1996 to 1999 I was roadmaster in charge of the traffic

6 signals.

7     Q.    That was going to be my next question.  What do

8 the duties of the roadmaster consist of?

9     A.    The roadmaster oversaw the operation of the

10 employees that worked for the township and also worked on

11 the roads themselves.  They handled all the duties of

12 supervising the employees, determining the work tasks, and

13 pretty much doing the work themselves if they had to.

14         MR. BREW:  Okay, so let's mark this.

15                - - -

16 (DEPOSITION EXHIBITS 1 and 2 marked for identification.)

17                - - -

18     Q.    Now, Mr. Hessinger, let me hand you what's

19 marked Deposition Exhibit 1 which is a notice of the

20 scheduling of these depositions; I believe we sent you a

21 copy of that.  Have you seen that before today?

22     A.    Yes.

23     Q.    And then I'll hand you Deposition Exhibit 2

24 which is a subpoena requesting your presence here today, and

25 I believe we sent you a copy of that?

1      A.      Yes.  I don't -- I don't totally recall this

2  attachment, but I'm not saying it wasn't there.  I probably

3  might not have paid attention to it.

4      Q.      Okay, fine.  The original subpoena requested you

5  to be here at eleven o'clock this morning, I believe, and we

6  changed that several times at your request, I believe?

7      A.      Yes.

8      Q.      To three o'clock today?

9      A.      Yes.

10                          - - -

11  (DEPOSITION EXHIBITS 3 and 4 marked for identification.)

12                          - - -

13      Q.      Mr. Hessinger, in this case we're specifically

14  interested in the intersection of Downs Drive and upper

15  Peach Street, the Zemenco property, Nick Scott's property,

16  some of the Developers Diversified property on the east side

17  of Peach Street.  Are you generally familiar from your work

18  as a supervisor of that area the properties, the roadways,

19  when I mention Downs Drive, Mandy Lane?  Do you have a

20  general familiarity?

21      A.      Yes, I do.

22      Q.      Okay.  Can you kind of run us through this and

23  go back as far as your knowledge is concerned with regard to

24  the, first of all the purchase of Andy's property by

25  Developers Diversified?  Did you gain knowledge of that

1  proposed purchase in 1999 at some time?

2     A.     Just verbal discussions with -- I think we were

3  meeting with Gary Hough for Developers Diversified at the

4  time.  Hoag or Howe, I'm not sure.

5         MR. GEARY:  He pronounces it "How".

6     Q.     Am I correct that over the years you have had

7  meetings with Developers over their various developments in

8  the township in the Peach Street area?

9     A.     Yes.

10     Q.     But as 1999 went on, did there become an issue

11  with regard to the intersection of Downs and Peach Street?

12     A.     Yes.

13     Q.     The signaling of it, the intersection itself?

14     A.     I think the discussion started in 1998.

15     Q.     Okay.  Can you just sort of generally fill us in

16  and tell us what that situation was, how it was brought to

17  your attention, what the township's involvement was at the

18  time?

19     A.     Yes, Developers Diversified was developing the

20  property between Zemenco, Inc.'s property and a roadway

21  called Douglas Drive, and Douglas Drive is the only access

22  at that current time to the property.  And we were asking

23  for additional traffic improvements and access improvements

24  to that property.  That's where they were building Home

25  Depot, Circuit City and Petsmart, and through the

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1  discussions they were going to, in fact, they've already

2  dedicated a road called Fern Court --

3      Q.    Can you spell that?

4      A.    F-e-r-n.  Which would be just north of Downs

5  Drive.  And then the problem with that was the proximity to

6  Douglas Parkway; it was too close to have a traffic signal

7  there.  So they said that they were going to pursue putting

8  in a roadway at Downs Drive and connecting it to their plaza

9  and signalizing that intersection.

10     Q.    And you think this was in '98 that this

11  discussion took place?

12     A.    Yes, because we entered into -- in '98 we

13  entered into an agreement with Developers Diversified that

14  they would make the highway improvements and they would

15  utilize Downs Drive instead of Fern Court.

16     Q.    Okay.  Let me show you these next; this may be

17  what you're talking about.  This is marked Exhibit 3.  Is

18  that an agreement between -- number one, is that an

19  agreement between Developers and the township?

20     A.    Yes.

21     Q.    And that's dated January 11, 1999?

22     A.    There is a previous agreement that dealt with no

23  occupancy to the stores until they made traffic improvements

24  on Peach Street, and this agreement followed the previous

25  agreement.  This agreement is where they come back and we

1  compromised on their improvements to incorporate the use of

2  Downs Drive instead of Fern Court.

3      Q.    There was a second agreement, Richard, which is

4  Exhibit 4 which followed this agreement.  You probably ought

5  to look at those two, because I've had a chance to look at

6  those today and you haven't, frankly.

7      A.    Yes, there was still an agreement that we

8  approved in '98 that dealt with the occupancy permits for

9  the plaza, and then this agreement followed from that

10 agreement.

11     Q.    Okay, you're saying the January agreement was

12 actually then a second agreement?

13     A.    Right, because the first agreement actually

14 started when Home Depot opened up, and they opened up in

15 1996.

16     Q.    Okay, we don't have that agreement in front of

17 us, but can you tell us generally what it set out to do, the

18 first agreement, the one we don't have?

19     A.    The first agreement set out to outline the

20 transportation improvements they would make for their plaza

21 and we would allow them to build the -- start beginning to

22 build the plaza and that no occupancy would be granted until

23 all traffic improvements were made.

24     Q.    Do you know what businesses you were talking

25 about?  Can you say now?

1      A.      Yes.    Now they are Circuit City and Petsmart.

2   At that time they were just retail A and retail B, and this

3   all came from when they opened up Home Depot.

4      Q.      You mean the additional traffic?

5      A.      No, the agreements.  They were to make -- they

6   did a traffic study.  First I should back up.  In 1996 they

7   did a traffic study and their traffic study outlined

8   improvements they needed to make to Peach Street to handle

9   the traffic counts that they generated out the ITE, the

10  engineering standards for the retail space of Home -- which

11  is now Home Depot, Circuit City and Petsmart, and their

12  traffic plan they agreed to do.  So we signed an agreement

13  with them that they could occupy Home Depot but they would

14  have to make those improvements that their traffic study

15  come up with and approved by PennDOT.

16     Q.      Okay.

17     A.      And, well, then after that happened they wanted

18  to get building permits to start the other two stores.

19     Q.      Can you name those other two stores?

20     A.      That was Circuit City and Petsmart.

21     Q.      Okay.

22     A.      So we gave them occupancy for Home Depot and

23  then we entered into an agreement what improvements they

24  would make and they could then get their building permits

25  for the other two stores which was at that time retail A and

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  retail B, and that was the agreement that we approved in

2  1998.

3      Q.     Now, did that agreement include --

4      A.     It might have even been 1997.  I'm not really

5  sure, because there was quite a bit of time that passed.  It

6  started in '96, went into '97, but 1998 is when we

7  discussed, we started the discussions of Downs Drive.

8      Q.     That was going to be my next question.  Did that

9  agreement then include improvements to Downs Drive, the

10  earlier agreement?

11      A.     Yeah, the earlier agreement gave them an option

12  that if they could enter into an agreement with the

13  neighboring property which was Zemenco, Inc., then they

14  could either build Fern Court or they could build Downs

15  Drive, whichever one.  But the original agreement totally

16  dealt with Fern Court.  They were going to put a new

17  intersection with a right-in, right-out only.

18      Q.     Was Fern Court ever built?

19      A.     No.  Currently it's a temporary driveway that's

20  been blacktopped and they have a temporary permit from

21  PennDOT.

22      Q.     Okay, now, if we come into 1999 then, I'm now

23  looking at Exhibits 3 and 4.  Can you just give us the oral

24  history of those agreements, how did they come about?

25      A.     They came up with the alternative traffic plan

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  that was scaled down from the one that their traffic

2  engineer submitted, and this agreement pretty much spelled

3  out what improvements they would make, and of course item

4  number 7 is probably the most important.

5      Q.    You're looking at Exhibit 3 now?

6      A.    Exhibit 3, item number 7 or paragraph 7.

7  Developer agrees to construct East Downs Drive to the

8  intersection point with Mandy Lane marginal access road

9  including the extension of Mandy Lane to East Downs Drive

10  pursuant to plans and specifications approved by Summit.

11      Q.    Okay.

12      A.    And so that was a change to their -- to the

13  original transportation plan that they come up.  That's when

14  they shifted from Fern Court to Downs Drive.

15      Q.    The change being the extension of Mandy to Downs

16  and then the use of Downs as an entrance and exit to Peach

17  Street?

18      A.    Right, and most of this was discussed in '98 and

19  it basically went back and forth on fine tuning it till

20  February.

21      Q.    Okay.  Now, then, can you bring us current with

22  the last agreement, the one in September of '99, Exhibit 4?

23  What brought that about?

24      A.    Well, when we signed the agreement dated

25  February 17th we were told that they have entered into an

1  agreement with Zemenco, Inc. to put the roads in.  Otherwise

2  we would have never agreed to this.

3      Q.      You never would have agreed to Exhibit 3?

4      A.      Exhibit 3.  We would have never agreed to that

5  unless, you know, we were under the understanding that they

6  had an agreement between Zemenco, Inc. and DDRC through a

7  second party which would be Nick Scott of Scott Enterprises.

8      Q.      They told you that they had an agreement to get

9  the land or to build the roads or both?

10      A.      Both.

11      Q.      Okay, and it was with Zemenco?

12      A.      They were going to purchase the land and build

13  the roads and improve the intersection.

14      Q.      And you say based on that the township executed

15  the Exhibit 3?

16      A.      Right.  So then we came to Exhibit 4, and this

17  agreement we entered into was when they came in and said

18  that the -- they developed problems in fulfilling the

19  agreement with Zemenco, Inc. and they said that they would

20  not be able to comply with Exhibit 3 because they were not

21  successful in purchasing the property.

22      Q.      And they would not then be able to complete the

23  Downs Drive intersection as they had agreed?

24      A.      Right.

25      Q.      So then you enter into the new agreement in

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1  September, the Exhibit 4?

2      A.      Right.

3      Q.      In that agreement does Summit get some extra or

4  additional consideration from Developers?

5      A.      Yes.

6      Q.      Can you explain what that is and what that was?

7      A.      First it references what paragraphs that they

8  would comply with on the Exhibit 3.

9      Q.      Right.

10      A.      Then also we reduced the financial security for

11  the Peach Street improvements because they were not building

12  Fern Court.  They agreed to install a traffic signal at

13  Downs Drive even though they wouldn't at this point in time

14  have access to the intersection, and they would escrow

15  eighty thousand dollars toward that.  Item paragraph 5, they

16  would have all the work done within six months of the items

17  they could do, and then 7, they would make improvements to

18  Commons Drive north of Keystone Drive and they would make

19  improvements to Douglas Parkway, and they would signalize

20  the intersection of Douglas Parkway and Commons Drive, and

21  this was to help with the traffic that has to use Douglas

22  Parkway, Commons Drive because they don't have the new

23  entrance done.

24      Q.      So there are other streets and entrances other

25  than Downs in this agreement?

1    A.    Right.    Then they also agreed to pay the

2 township seven thousand dollars a month for every month they

3 do not complete the road work for Downs Drive and Mandy

4 Lane.

5    Q.    Okay.    What was the purpose of that?

6    A.    Well, the agreement says for maintenance.

7    Q.    Okay, I mean I can make that question clearer.

8 I guess I don't see where the township's going to be

9 spending seven thousand a month.    It's not a reimbursement,

10 is it, for an expenditure or a projected expenditure?

11    A.    Yes, it would be -- according to the agreement

12 it would be an expenditure for future expense that you would

13 have on maintenance of these roadways.    I would say the

14 biggest reason for this is because they wanted occupancy

15 permits for retail A and retail B which became Circuit City

16 and Petsmart, so they come back with an offer that they

17 would put money into a maintenance fund, because that's

18 legally the only way that they could advance the township

19 money, that they would be willing to advance the township

20 money for maintenance in return for occupancy permits.

21    Q.    Now, I see that's the agreement, that's

22 paragraph 8, right?

23    A.    Right.    And then paragraph 9, in consideration

24 of receiving this money we would issue the occupancy permits

25 for Petsmart and Circuit City.

1    Q.    If you look at paragraph 7, is that related to

2  Downs Drive, the hundred and twenty-five thousand dollar

3  escrow fund?

4    A.    No, that was in -- that was for improvements to

5  the traffic signals on Douglas Parkway.

6    Q.    Okay.

7    A.    Paragraph 4 was the one that dealt with the

8  improvements to Downs Drive and Peach Street.

9    Q.    Okay.  In your tenure as township supervisor

10  have you been familiar with the township's transportation

11  plan?

12    A.    Very much involved.

13    Q.    Has the township had a transportation plan for

14  several years?

15    A.    Yeah, the township worked on the transportation

16  plan in 1989 in cooperation with the Erie County Planning

17  Department.  They assisted us in trying to develop a future

18  traffic plan as the township grew.

19    Q.    Can you tell us on the current township

20  transportation plan how does it show or describe Downs

21  Drive?

22    A.    Downs Drive would go from Peach Street, follow

23  the property line between Zemenco, Inc. and the property now

24  owned by Scott Enterprises and follow that property line.

25  It would first go east to a point where the property changes

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    to a south direction, it would go to 90 and then from there

2    it would continue over the culvert by 90 and then follow the

3    power lines.

4        Q.    The right-of-way?

5        A.    The power line right-of-way down through

6    Zemenco, Inc.'s property, and the long-range plan is for

7    that road to connect up with Douglas Parkway coming from the

8    other direction and it coming back and meeting to a point

9    and then continuing to Cherry Street Extension.

10       Q.    Now, does the transportation plan, the current

11   one, show Mandy Lane?

12       A.    The map does not show Mandy Lane.  When this

13   development occurred for Home Depot, the township amended

14   the transportation plan at the request of Developers

15   Diversified.  The road that was there on the existing plan

16   followed the property lines of the existing properties, and

17   I can't remember the names of all the property owners, but

18   the biggest one was Hallman Pontiac, and it followed the

19   back property line of Hallman Pontiac, and when they bought

20   the property for the plaza they bought all the parcels and

21   so they asked to redefine the roadways.

22       Q.    Developers did?

23       A.    Developers did, simply for the reason to -- if

24   the township looked at a roadway through a property that

25   they want to build a building, then nobody can do anything

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1     for a year, and it was thought better to change the plan.

2         Q.      Okay.

3         A.      So the township moved the road to the west to

4     line up with what we now call Mandy Lane.

5         Q.      There was a question raised this morning, maybe

6     you can help us.  Is Mandy Lane a street, a road, a private

7     way?  How would you describe Mandy Lane as it exists today?

8         A.      Marginal access street with the original portion

9     of the road by the properties bordering Eat'N Park and

10     National City Bank, which is no longer, it's now Northwest

11     Bank, that right-of-way is thirty-three feet and that was to

12     be a marginal access street and that was to continue up to

13     Downs Drive.

14         When they looked at it, the other street,

15     Commons Drive, it was supposed to be a fifty-foot right-of-

16     way street and continue all the way up and that was supposed

17     to intersect Downs Drive at the east end where it made the

18     property line change to the south.  And so there was two

19     roads.  One was a marginal access street and the other road

20     was to be a local street or a commercial street, and when

21     they combined them Developers Diversified said, well, they

22     would dedicate fifty feet and that way the road could be

23     utilized either way.  It could be a commercial street or it

24     could be a marginal access street.

25         Q.      And is Mandy Lane dedicated fifty feet?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1     A.     Yes, on the property that the plaza is on.  It's

2 still thirty-three feet by Eat'N Park, so it necks down

3 there.

4     Q.     Okay.  Did there come a time in 1999 when you

5 learned that this proposed purchase by Developers of

6 Zemenco's land was not going to go through?

7     A.     Yes.

8     Q.     Sometime in 1999?

9     A.     Yes.

10     Q.     Was that -- okay.  Was there then any

11 discussions that you know of between Developers and Summit

12 with regard to the condemnation of part of Zemenco's land?

13         MR. SENNETT:  At this point I'm going to

14         object to this line of questioning in regard to

15         the condemnation as to -- I guess number one

16         I'd ask as to the relevance concerning your

17         contract claim with DDRC, and second, in order

18         so that everyone understands and is protected,

19         if we get into any discussions between

20         attorney-client privilege between Summit

21         Township that Summit Township has not voted to

22         waive any discussions concerning attorney-

23         client privilege, and Mr. Hessinger, based on

24         any information he would have received during

25         that process, obviously can't disclose that,

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    and just so -- I don't know where we're

2    heading, but before we get there I wanted to

3    put that on the record.

4         MR. BREW:  Well, can we have some ground

5    rules?  I mean if you're going to instruct him

6    not to answer, can you just do so?  If you just

7    want to object to get it on the record to

8    protect it from ever coming in later, can you

9    handle it that way?

10        MR. SENNETT:  We can go question by

11   question.  I just wanted to make sure --

12        MR. BETZA:  Yeah, there may be some

13   questions that he's not going to be able to

14   answer.

15        MR. BREW:  Okay, but I mean so you're not

16   leaving us all in the dark can you when you

17   object just instruct the witness not to answer?

18        MR. SENNETT:  Certainly.

19   Q.     At this point I was just trying to get the

20   general situation at the time, and I think my question was

21   did there come a time in 1999 when discussions about

22   condemning part of Zemenco's land came up?

23   A.     Yes, I can even go back further.  Andy

24   Zafiropoulos come into the office and asked if he could see

25   the roadway plans, and I went back to the planning office

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    and laid out the plans and showed him what we were doing,

2    because I was quite surprised that he didn't know more than

3    I knew because it was his property, and he seemed very

4    surprised when I showed him Mandy Lane.  And so I kind of

5    figured right then that there was a problem.

6         Q.    You mean the location of Mandy Lane to the north

7    of his property?

8         A.    Well, he said he wasn't aware of Mandy Lane at

9    all was the statement he made to me.

10        Q.    But I mean the plot if you recall that you were

11   showing him, was the Mandy Lane north of his property?

12        A.    Right, it was extending Mandy Lane from where it

13   exists currently to Downs Drive which would be on his south

14   property line.

15        Q.    Okay.

16        A.    So then we had a meeting in June with Gary

17   Hough, I think his attorney, Vanwinkle, and Greg Rubino and

18   myself and Marlin Coon, and we sat down and discussed the

19   problem, basically discussed Exhibit 3, what to do about

20   Exhibit 3, because they signed an agreement with us that

21   they would build it and they said they were not successful

22   in entering into a sale for the property of Mandy Lane.

23        Q.    Okay, and you had confirmed that with Andy then?

24        A.    Yes.

25        Q.    That there was going to be no sale.  Okay.  Was

1  it then at that point that discussion came up about

2  condemning or the possibility of condemning land?

3      A.      Yeah, I think when we had that discussion in

4  June basically they had three alternatives.  They had to

5  figure out how to buy the property, the township could

6  condemn the property, or third, they just could not open

7  their stores.  And, of course, they felt the third option

8  was -- they would have to say the third option wasn't

9  possible.

10     Q.      The third option was what?

11     A.      Not to open the stores.

12     Q.      Okay.  Okay.

13     A.      So at that particular time I think we

14  instructed -- I believe they asked Vanwinkle to talk with

15  Tim Sennett, the township solicitor, to come to some

16  conclusion to determine if the township had the right to

17  condemn the property for the roadway.

18     Q.      Was this in the summer of '99?

19     A.      Yes.

20     Q.      Okay, and then Mr. Sennett came back and said

21  you have the right to do this eventually?

22         MR. SENNETT:  Well, I'm --

23     Q.      Well, this is just history.

24     A.      I think that was discussed at a public meeting.

25         MR. GEARY:  I'm going to object to the

1    question just because the question was asking

2    Mr. Hessinger what Mr. Sennett told them which

3    I think is asking for a confidential attorney-

4    client communication.

5        Q.    Let me ask another question.  If you can, Mr.

6  Hessinger, can you pick it up here and tell me about the

7  discussions with Developers, if any, with regard to how the

8  Zemenco property was going to be paid for if it were

9  condemned?  Who was going to pay for it?

10       A.    We told them that if we did do a condemnation

11  they'd have to pay all costs.

12       Q.    Developers?

13       A.    The developer would have to pay all costs.

14       Q.    So we're proceeding along then, is that it,

15  without pinning down dates and months and everything?

16       A.    Right.  Basically the township was asking for

17  certain improvements to handle the traffic flow coming out

18  of the plaza.  They came back with the plan.  We agreed to

19  it.  So we told them it was their financial responsibility.

20       Q.    Now, who hired Mr. Sammartino?  The township or

21  Developers?

22       A.    The township.

23       Q.    And then did the township meet with Mr.

24  Sammartino in 1999?

25       A.    I've never -- I don't even know him if he walked

1  in the door.  I don't know who he is.

2      Q.     Do you know whether or not Mr. Coon met with Mr.

3  Sammartino?

4      A.     I don't know that either.

5      Q.     But you never met with him?

6      A.     I have never met with him.  But I would get back

7  to your previous question --

8      Q.     Which was?

9      A.     That we came to a township meeting in June.  We

10  were given a -- and I don't think that's client privilege

11  because at a township meeting we were told we had a right to

12  condemn, and a motion was made to condemn the property.

13      Q.     Right.  Okay, we have a copy of that.

14      A.     And that's all I was trying to say.  I wasn't

15  trying to divulge anything beyond that.

16      Q.     Okay.  Was there a motion passed to hire Mr.

17  Sammartino when you were present?

18      A.     We took some action to have the property

19  appraised, and I'm not -- I would have to look at the

20  minutes to see exactly how we did it, if we instructed our

21  solicitor to hire an appraiser.  I think we left it up to

22  our solicitor.

23      Q.     Okay, so there may not have been a formal

24  motion?

25      A.     I think we made a formal motion to go ahead and

1  do the appraisal.  I don't just remember if we specifically

2  stated a name, because we had to see who was available.

3      Q.    In 1999 did supervisor Coon have meetings with

4  Developers Diversified people, if you know?

5      A.    Yes.

6      Q.    Were they public meetings or private meetings?

7      A.    Private.

8      Q.    Were you invited to them?

9      A.    No.

10     Q.    Do you know whether or not Sammartino ever

11  completed an appraisal?

12         MR. SENNETT:  I object to the question.

13         What's the relevance of this line of

14         questioning in regard to any of the --

15         MR. BREW:  Well, again, I don't want to

16         get into any arguments.  I mean, as you know,

17         this is discovery and it's just whether or not

18         it could lead to, but if you're going to tell

19         him not to answer, then --

20         MR. SENNETT:  I think it's divulging

21         attorney-client privilege of Summit Township

22         which hasn't been waived.

23         MR. BREW:  Only whether or not there was

24         one completed?  That's all I'm asking him.

25         MR. SENNETT:  That's divulging

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

27

1        attorney-client information that --

2           DEPONENT:  I could say for the record,

3        though, I have never seen and I'm not aware of

4        seeing an appraisal report.

5        Q.    Okay.  Are the escrow accounts that we discussed

6    and they're in Exhibits I think 3 and 4, were they still

7    being maintained when you left office, to your knowledge?

8        A.    Yes.  Yes, because all of them were given, you

9    know, the escrows were all put into escrow at the time of

10   the agreement, and item number 8 was a payment per month,

11   they escrowed a year's payment up front, and that was in

12   existence when I left office.

13       Q.    Okay.  Were there meetings that you attended

14   with the supervisors where it was discussed putting the

15   appraised value of Andy's property in escrow?

16          MR. SENNETT:  I guess I've got to

17       understand the question.  Are you talking was

18       there a discussion in a public meeting?

19          MR. BREW:  Well, that's what I'm asking.

20       That's going to be the next.  I don't know.

21       He's going to have to tell me.

22          MR. SENNETT:  Well, any meetings between

23       the supervisors and myself in regard to the

24       condemnation case is attorney-client privilege.

25       Q.    Well, you just, Rich, you have to tell me yes,

1  there was but it was private with the solicitor --

2       MR. SENNETT:  No, he can't even tell

3   you -- there is no right for him to say whether

4   there was a meeting or not.

5       Q.    Well, sure there is.  I mean you can answer the

6   question.

7       A.    What was the question again?

8       Q.    Were there any meetings wherein it was discussed

9   that monies would be put in escrow to match the appraised

10  value of any property of Zemenco's that was going to be

11  condemned?  Just were there any meetings, first of all.

12      A.    No.

13      Q.    Okay, that's easy.

14      A.    There weren't any meetings.  You're talking

15  about public meetings?

16      Q.    No, I was saying any meetings.  If they were

17  private with the solicitor, then I was going to stop.

18      A.    Yes, we had some meetings with the solicitor.

19      Q.    But no public meetings.

20      A.    But we didn't have any private meetings with the

21  Developers or anything like that.  Basically I asked the

22  question early on is what's the procedure for a taking and

23  they said that there would have to be a bond placed with the

24  courts.

25      Q.    The solicitor explained the procedure then

1  basically?

2      A.      Right.   And again the agreement with the

3  Developers, they were responsible for any costs including

4  any bonds.

5      Q.      Has the location of the traffic signals at Peach

6  and Downs changed in the last several years on the plans?

7      A.      No.

8      Q.      They've always been --

9      A.      The only one that changed, which doesn't affect

10  this property, the only one that was moved was Rotunda

11  Drive.   The original transportation plan that we did in 1989

12  had the location of Downs Drive and Douglas Parkway on the

13  original plan.

14      MR. BREW:   Okay, let me just talk to Andy

15      for a minute.

16  (Brief recess.)

17      Q.      Just one more area here.   Rich, were there any

18  discussions in '99 among the supervisors without the

19  solicitor being present with regard to the purchase by

20  condemnation or direct purchase, whatever, of Andy's land

21  and the price therefor?

22      A.      I'd say it was probably the topic of

23  conversation the whole year.

24      Q.      Well, supervisor Coon, did he have a position or

25  an attitude on that, on the purchase of Andy's land or the

1  condemnation of it?

2       A.     Yes.

3       Q.     What was that?

4       A.     He felt that -- I guess I don't know how to

5  phrase it -- Andy was less than cooperative and that Andy

6  was not following the contract on the property.

7       Q.     With Developers?

8       A.     With Developers.  So therefore, well, I would

9  say that in July we had a special meeting, that was in July

10 or last week in June, I don't remember which.  We had the

11 public hearing to take input.  I always took the attitude

12 that we should try to work to resolve this issue

13 cooperatively and voluntarily rather than having to utilize

14 the court system, and every time I brought this up Marlin's

15 attitude -- Marlin Coon's attitude was that, no, he wasn't

16 going to do anything to help Andy.

17      Q.     Andy Zafiropoulos?

18      A.     Right.  So therefore I got shot down every time

19 I tried to bring it up.

20      Q.     Okay, this was pretty much his attitude

21 throughout 1999?

22      A.     Yes.

23            MR. GEARY:  Object to the leading

24      question.

25            MR. BREW:  That's all I have.  Thanks.

1          MR. GEARY:  I don't have any questions.

2  (Deposition concluded at 3:50 p.m.)

3                  * * * * * * * * * * *

1                              CERTIFICATE

2        I, Cecelia H. Muhanna, court reporter, hereby certify

3   that the within named deponent was first duly sworn by me to

4   testify to the truth in the cause aforesaid, that his

5   testimony was by me reduced to stenotypy notes in his

6   presence, and the foregoing is a correct transcript of the

7   notes so taken.

8        I further certify that I am in no way interested in the

9   event of this action.

10

11                         _____
                                    Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

DEVELOPERS DIVERSIFIED     : IN THE COURT OF COMMON PLEAS
REALTY CORPORATION            :
            Plaintiff     : OF ERIE COUNTY, PENNSYLVANIA
                          :
       v.                    :
                          :
ZEMENCO, INC.                    :
            Defendant    : NO. 11919 - 1999

### <u>NOTICE OF DEPOSITION DUCES TECUM</u>

TO:    Stanley R. Geary, Esquire         Mr. Richard Hessinger
       Buchanan Ingersoll, PC          Summit Township Supervisor
       One Oxford Centre              8900 Old French Road
       301 Grant Street, 20th Floor        Erie, PA   16509
       Pittsburgh, PA 15219-1410

        Notice is hereby given that the deposition of **RICHARD HESSINGER** will be taken for the purpose of discovery under the Pennsylvania Rules of Civil Procedure at the office of McClure & Miller, 717 State Street, Ste. 701, Erie, Pennsylvania 16501, on **Monday, January 10, 2000, at 11:00 a.m.** at which time you should appear and take part.

        The scope and purpose of this deposition is to inquire into the facts, circumstances, and results of the incidents which make up the basis of the within litigation.

        Please bring with you your entire file, including correspondence, documents, appraisals relative to the real estate of Zemenco, Inc., Developers Diversified Realty Corporation, or any of the Scott entitities situate in Summit Township, Erie County, Pennsylvania, and located east of Route 19 and north of I-90, and any other documents as set forth in the Subpoena to be served on you.

                     By: _____
                         Eugene J. Brew, Jr., Esquire
                         McClure & Miller
                         717 State Street, Suite 701
                         Erie, PA 16501-1355
                         (814) 453-3681

**DEPOSITION EXHIBIT**

*1*

Date:   December /5, 1999

cc:    Richard Hessinger
       Stanley R. Geary, Esquire
       Hines, Muhanna & Flowers

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Deposition Duces Tecum was served upon all counsel of record on the below date by U.S. Mail, postage prepaid, addressed as follows:

> Stanley R. Geary, Esquire
> Buchanan Ingersoll, PC
> One Oxford Centre
> 301 Grant Street, 20th Floor
> Pittsburgh, PA 15219-1410

By: _____
　　　Eugene J. Brew, Jr., Esquire

Dated: December /5, 1999

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ERIE

DEVELOPERS DIVERSIFIED REALTY CORPORATION
                    Plaintiff                      :
                                                   :
                                                   :
              v.                                   :     File No. ___11919 - 1999___
                                                   :
ZEMENCO, INC.                                      :
                              Defendant            :

SUBPOENA TO ATTEND AND TESTIFY

**DEPOSITION EXHIBIT**
α

TO:   Richard Hessinger c/o Summit Township Supervisors
      ___8900 Old French Road___
      ___Erie, PA   16509___

1.  **You are ordered by the court to come to** _the offices of McClure & Miller, 717 State_
    ___Street, Suite 701, Erie, PA  16501___

                  (Specify courtroom or other place)
at   ___Erie___, ___Erie___ County, Pennsylvania, on _Monday, January 10, 2000_
at   _11 (Eleven)_ o'clock,   _A.M._, to testify on behalf of   _Zemenco, Inc._
_____
in the above case, and to remain until excused.

2.  And bring with you the following: _____See attached sheet._____
_____
_____

    If  you  fail to attend or to produce the documents or things required by this subpoena
you  may  be  subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules
Civil Procedure, including but not limited to costs, attorney fees and imprisonment.

REQUESTED BY A PARTY/ATTORNEY IN COMPLIANCE WITH Pa.R.C.P. No. 234.2(a):

NAME:  _Eugene J. Brew, Jr., Esquire_

ADDRESS: _717 State Street, Ste. 701_

         _Erie, PA   16501_

TELEPHONE: ___(814) 453-3681___

SUPREME COURT ID # _06500_

                                        BY THE COURT:

                                        ___[signature]___
                                        Prothonotary/Clerk, Civil Division

                                        ___[signature]___
DATE: _December      , 1999___                              Deputy
      Seal of the Court

OFFICIAL NOTE:  This  form  of  subpoena  shall  be  used whenever a subpoena is issuable
including   hearings   in   connection   with   depositions  and  before  arbitrators,  masters,
commissioners, etc.  in  compliance with Pa.R.C.P. No. 234.1.  If a subpoena for production
of documents, records or things is desired, complete paragraph 2.

DEVELOPERS DIVERSIFIED v. ZEMENCO, INC.


ATTACHMENT TO SUBPOENA

OF RICHARD HESSINGER


All documents in any way related to the real estate owned by Zemenco Inc. located on the east side of Peach Street, north of I-90 in Summit Township, Erie County, PA, including, but not limited to, correspondence, letters, or any communications with Summit Township, Summit Township Supervisors, solicitor, or other agents of Summit Township, correspondence, letters, faxes, documents, with any agents or employees of Developers Diversified Realty Corporation regarding said property; communications, letters, correspondence with Nick Scott or any agent or employee of any of the Scott companies related to the within-described property.

BK0614PG0687

FEB 17

# DEVELOPMENT AGREEMENT

THIS DEVELOPMENT AGREEMENT is made this 11th day of January 1999 at

Erie, Pennsylvania; by and between:

## DEVELOPERS DIVERSIFIED OF PENNSYLVANIA, INC.

34555 Chagrin Boulevard

Moreland Hills, Ohio 44022

(hereinafter "Developer")

AND

## TOWNSHIP OF SUMMIT

8920 Old French Road

Erie, Pennsylvania 16509

(hereinafter "Summit")

**WHEREAS**, Developer desires to modify the public road improvements and other public

improvements previously proposed in Developer's agreements and traffic plans submitted to

Summit for Developer's Peach Street Square, Phase II Project; and

**WHEREAS**, Summit desires to have these public road improvements and other public

improvements completed in a timely fashion; and

**WHEREAS**, Developer and Summit desire to set forth the terms and conditions

concerning the completion of the public road improvements and other improvements;

**NOW, THEREFORE**, intending to be legally bound hereby, the parties hereto covenant

and agree as follows:

-1-

**DEPOSITION EXHIBIT**

3

17⁵⁰
ᴱᴺᴶ

BK0614PG0688

1.    The above-referenced recitals are incorporated by reference.

2.    In consideration of the Developer agreeing to the following improvements and payments, Developer and Summit agree Developer will not be obligated to construct Fern Court Drive and its related Peach Street road improvements.

3.    Developer will construct a new eleven-foot-wide right turn lane in accordance with Summit's specifications from Damon's driveway west on Douglas Parkway and merging with the existing sweep lane.

4.    Developer will construct Downs Drive intersection at Peach Street including a four-way traffic signal, and all Peach Street Improvements, to the approval of Summit. All construction will be subject to the issuance of both a Highway Occupancy Permit and Signal Permit by Pennsylvania Department of Transportation.

5.    Developer will contribute an amount not to exceed $125,000.00 for the design and installation of a new four-way, two phase traffic signal at the intersection of Commons Boulevard and Douglas Parkway. This amount will also reimburse Summit for labor and material costs incurred to re-program, revise, construct or alter the traffic signal and pavement markings at Douglas Parkway and Peach Street intersection. Summit will provide the necessary invoices and documentation for coordination, design, construction or alteration of the signal and intersection.

6.    Developer will construct at the southeast corner of Douglas Parkway and Commons Boulevard an acceleration lane eastward to blend traffic into the next intersection pursuant to plans and specifications approved by Summit.

7.    Developer agrees to construct (East) Downs Drive to the intersection point with

BK0614PG0689

Mandy Lane marginal access road including the extension of Mandy Lane to (East) Downs Drive pursuant to plans and specifications approved by Summit.

8.    Developer and Summit agree that Summit will not issue any further occupancy permits for any structure in Peach Street Square, Phase II Project until the above-referenced public road improvements and other public improvements and all other requirements of the paragraph of this Agreement have been met by Developer to the satisfaction of Summit.

9.    Developer will provide a new performance bond or other acceptable financial security for the above road improvements or other improvements and commitments in this Agreement in an amount acceptable to Summit.

10.    Developer will have all proposed tenants of retail stores and other establishments in Peach Street Square, Phase II Project, including Major Retail B and Major Retail D, execute this Agreement or provide separate acknowledgment of their knowledge and understanding of this Agreement.  Summit will only provide building permits to those tenants who have provided such acknowledgment.

11.    Developer shall not assign this Agreement or its rights or obligations under this Agreement without prior consent of Summit.

12.    Developer will comply with all requirements of all applicable Ordinances of Summit.

13.    This Agreement shall terminate when all public improvements referenced herein have been completed.

BK 0 6 1 4 PG 0 6 9 0

IN WITNESS WHEREOF, the parties hereto have set their hands and seals and caused

this agreement to be executed by their authorized officers on the day and year first written above.

WITNESSETH

DEVELOPERS DIVERSIFIED OF
PENNSYLVANIA, INC.

BY: _____
John R. McGill, Vice President
& Director of Development

SUMMIT TOWNSHIP

BY: _____

BK0614PG0691

COMMONWEALTH OF PENNSYLVANIA        )
                                    )
COUNTY OF ERIE                      )


On this, the 22nd day of January, 1999, before me, a Notary Public, the undersigned officer, personally appeared Paul L. Dahlkemper, chairman of the Summit Township Board of Supervisors, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Sharon L. Risjan_
Notary Public

Notarial Seal
Sharon L. Risjan, Notary Public
Summit Twp., Erie County
My Commission Expires Jan. 8, 2002

Member, Pennsylvania Association of Notaries

MY COMMISSION EXPIRES:


STATE OF OHIO                       )
                                    )
COUNTY OF CUYAHOGA                  )


On this, the 20th day of January, 1999, before me, a Notary Public, the undersigned officer, personally appeared John R. McGill, who acknowledged himself to be the Vice President of Developers Diversified Realty Corporation, and that he, as such Vice President, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Peggy L. Jenkins_
Notary Public

MY COMMISSION EXPIRES:    PEGGY L. JENKINS, Notary Public
                          State of Ohio
                          My Commission Expires Nov. 9, 1999

BK 0662 PG 1271

# AMENDED DEVELOPMENT AGREEMENT

THIS AGREEMENT is made and entered into this 14TH day of September, 1999, by and between:

**DEVELOPERS DIVERSIFIED OF PENNSYLVANIA, INC.**
3300 Enterprise Parkway
Beachwood, Ohio 44122
(hereinafter "Developer")

AND

**TOWNSHIP OF SUMMIT**
8920 Old French Road
Erie, Pennsylvania 16509
(hereinafter "Summit")

WHEREAS, Developer and Summit have entered into a Development Agreement dated January 11, 1999 concerning Peach Street Square Phase II Project; and

WHEREAS, Summit and Developer wish to amend certain terms of that Agreement; and

NOW, THEREFORE, intending to be legally bound hereby, the parties hereto covenant and agree as follows:

1.    Developer has and will comply with paragraphs 2, 3, 6, 9, 10 of the January 11, 1999 Agreement. Developer will complete the requirements of these paragraphs to the satisfaction of Summit by October 1, 1999.

2.    Developer will provide financial security of $700,000 to the Township for future Peach Street improvements and other road improvements as required under paragraphs 5 and 6 of this Agreement.



DEPOSITION
EXHIBIT
4

1750

BK 0662 PG 1272

3.    Developer will install and have a traffic signal operational on a temporary permit at Downs Drive and Peach Street by November 10, 1999 contingent upon receipt of the temporary permit from the Pennsylvania Department of Transportation by September 20, 1999.  If the temporary permit is not received by September 20, 1999, for each day the permit is not received, the deadline of November 10, 1999 will be extended one day.  Developer agrees to begin construction of said traffic signal within ten days of receipt of said temporary permit.

4.    Developer will establish an escrow fund in the amount of $80,000.00 upon execution of the Agreement with Summit, which permits Summit Township's withdrawal of funds without permission of Developer upon Developer's failure to complete the improvements required in paragraph 3 by the established deadline.  This escrow fund is an additional amount not included in the $700,000 financial security referenced in paragraph 2.

5.    Developer will construct the improvements of paragraph 7 of the January 11, 1999 Agreement within six (6) months, unless amended by Summit due to seasonal or adverse weather conditions, of the acquisition of the rights-of-way acquired through an eminent domain proceeding initiated by Summit or through negotiation or lawsuit by Developer.

6.    Developer will construct the following additional improvements:

(a)    Commons Drive – North of Keystone Drive

(i)    Remove grass boulevards, install gravel base and full-depth asphalt.

(ii)    Construct additional northbound lane in present shoulder area from Lowe's entrance north to Tinseltown.  Extend catch basin easterly

- 2 -

BK0662PG1273

to re-establish in wing section.  Mill the slot, tack coat, and overlay entire road surface from Tinseltown south to Keystone Drive and apply striping, pavement markings and directional signage as required by Township.

(b)    Douglas Parkway

(i)    Excavate and replace gravel berm, install a curb and gutter, moving existing basin and reinstall with a type C lid.

(ii)   Install full-depth asphalt from north/south drive in Phase I, westerly to Commons Drive to create two eleven foot drive lanes.

(iii)  Install street signs on all internal streets, east of Peach Street.

7.    Developer will establish an escrow fund in the amount of $125,000.00 with Summit Township, which permits Summit Township 's withdrawal of funds without permission of Developer, to be used by Summit Township for the construction of the improvements referenced in paragraph 5 of the January 11, 1999 Agreement.

8.    Developer will provide an additional escrow amount of $84,000.00 for the continued maintenance of said Township road systems, including signals and signs within Developer's Peach Street Square Project to be drawn upon by Summit Township in the amount of $7,000 per month for maintenance.  If the portion of the escrow fund dedicated to maintenance is withdrawn to an amount of $21,000.00, Developer will deposit an additional $84,000.00.  This maintenance fund shall continue to be funded from the time of execution of this agreement until the date of completion of all improvements referenced in this Agreement and the January 11, 1999 Agreement.

BK 0662PG1274

9.    In consideration of the above, Summit Township hereby agrees to modify paragraph 8 of the January 11, 1999 Agreement and will issue occupancy permits for structures to be occupied by Petsmart and Circuit City, only, in Peach Street Square Phase II Project upon completion of the improvements set forth in paragraph 6.

10.    All other terms not specifically modified in the January 11, 1999 Agreement are affirmed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the day and year first above written.

WITNESSETH:

Norman E. Elbin

WITNESSETH:

Richard P Hessinger

DEVELOPERS DIVERSIFIED OF PENNSYLVANIA, INC.

BY

Eric M. Mallory

SUMMIT TOWNSHIP

BY

Paul L Dahlkemper

- 4 -

~~COMMONWEALTH OF PENNSYLVANIA~~ State of Ohio:                    )

                                                                    )          SS:

COUNTY OF ~~ERIE~~ *Cuyahoga*                                      )

On the _13th_ day of _Sept_, 1999 before me, personally appeared _Eric M. Mallou_, to me known to be the person named herein, who, being authorized to do so, executed the foregoing Amended Development Agreement and acknowledged to me that he read the foregoing authorization, understands the contents thereof and that he voluntarily executed the same.

PEGGY L. JENKINS, Notary Public
State of Ohio
My Commission Expires Nov. 9, 1999

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA                                       )

                                                                    )          SS:

COUNTY OF ERIE                                                     )

On the _14th_ day of _Sept_, 1999 before me, personally appeared _Paul L. Dahlkemper_, to me known to be the person named herein, who, being authorized to do so, executed the foregoing Amended Development Agreement, and acknowledged to me that he read the foregoing authorization, understands the contents thereof and that he voluntarily executed the same.

_____
Notary Public

#280006

Notarial Seal
Sharon L. Risjan, Notary Public
Summit Twp., Erie County
My Commission Expires Jan. 8, 2002
Member, Pennsylvania Association of Notaries