**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ZEMENCO, INC.,                          )
                                        )
          Plaintiff,               )
                                        )
             v.                )          Civil Action No. 03-175 Erie
                                        )
DEVELOPERS DIVERSIFIED                  )
REALTY CORPORATION,                     )
                                        )
          Defendant.               )

## MEMORANDUM OPINION

McLAUGHLIN, J.

       Presently pending before the Court is the Defendant, Developers Diversified Realty Corporation's Motion for Summary Judgment.

### I. BACKGROUND

       Plaintiff, Zemenco, Inc. ("Zemenco"), is a Pennsylvania corporation with its principal place of business in Erie, Pennsylvania. (Amended Complaint ¶ 1).[1]  At all times relevant herein, Zemenco owned and operated a manufactured home community known as Peachtree Place located in Summit Township, Erie County, Pennsylvania. (Id. at ¶ 5).

       On or about November 14, 1998, Zemenco and another Pennsylvania corporation, Scott's Development Company ("Scott's"), entered into an Agreement of Sale ("the Agreement") whereby Scott's agreed to purchase a 46 acre portion of land within Peachtree Place for $3,980,000. (Amended Complaint ¶ 6).  The Agreement required Scott's to make quarterly payments of $20,000 into an escrow account, with each payment being released to Zemenco 90 days thereafter, assuming neither party breached or defaulted on the contract.   In the event of a default by the purchaser, the Agreement contemplated that those payments received by Zemenco prior to default would constitute Zemenco's full liquidated damages:

       20. <u>DEFAULT</u>:

---

[1]     All citations to the "Complaint" in this opinion are to Plaintiff's Amended Complaint, Dkt. #25, filed on February 28, 2005.

>    A.    If Purchaser defaults hereunder, Seller shall retain any of the
>          Deposit then in its possession as full liquidated damages and
>          Seller shall have no other recourse thereafter.

(Amended Complaint, Exhibit A, Section 20).

Significantly, the parcel of real estate described in the Agreement included a narrow strip of land (the "intersecting parcel") constituting Zemenco's only frontage on Peach Street, a busy six-lane highway lined with shopping plazas.  (Amended Complaint ¶ 26-27).  To the west, on the opposite side of Peach Street, a small east/west road called "Downs Drive" pointed directly into the heart of the intersecting parcel. The Agreement contemplated that Downs Drive might eventually be extended to cross Peach Street and bisect the Zemenco property in an easterly direction:

>    29.  DOWNS DRIVE EXTENSION:
>
>          As additional consideration from Seller to Purchaser for entering into
>          this Agreement, Seller hereby agrees to allow Purchaser, at any time
>          after the date of mutual execution hereof, to construct an extension of
>          Downs Drive over and upon a portion of the Premises subject to the
>          parties' mutual approval of plans therefor, which approval shall not
>          be unreasonably delayed or withheld.

(Amended Complaint, Exhibit A, Section 20).

On November 20, 1998, Scott's assigned the Agreement to Defendant, Developers Diversified Realty Corporation ("Diversified"), an Ohio corporation that owned the land immediately to the north of the Zemenco property.  (Amended Complaint ¶ 14; Motion for Summary Judgment, Exhibit B).  Diversified had been using this land to develop a shopping center known as Peach Street Square.   However, unbeknownst to Zemenco, Summit Township had notified Diversified that the township would not issue any more retail occupancy permits for Peach Street Square unless Diversified could provide an additional means of ingress and egress to Peach Street. (Amended Complaint, Exhibit C, ¶ 8).  Because of an existing traffic light at the intersection of Downs Drive and Peach Street, Diversified had ascertained that its best solution would be to extend Downs Drive easterly to intersect with a small access road known as "Mandy Lane" that crossed Diversified's property from north to south, ending at the northern border of Zemenco's land.  Each of the conceptualized extensions, and the intersection thereby created, were located on Zemenco's

property.

In December of 1998, Diversified made its first $20,000 deposit into escrow. This payment was released to Zemenco from escrow in March, 1999. (Motion for Summary Judgment, ¶ 6).

On January 11, 1999, Diversified entered into a Development Agreement with Summit Township in which Diversified agreed to construct the extensions of Mandy Lane and Downs Drive in accordance with plans and specifications approved by Summit:

> 7. Developer agrees to construct (East) Downs Drive to the intersection point with Mandy Lane marginal access road including the extension of Mandy Lane to (East) Downs Drive pursuant to plans and specifications approved by Summit.
>
> 8. Developer and Summit agree that Summit will not issue any further occupancy permits for any structure in Peach Street Square, Phase II Project until the above-referenced public road improvements and other public improvements and all other requirements of the paragraph of this Agreement have been met by the Developer to the satisfaction of Summit.

(Motion for Summary Judgment, Ex. E, ¶¶ 7-8).

On May 25, 1999, Diversified presented Zemenco with a Reciprocal Easement Agreement ("REA") that would have allowed Diversified to begin construction on the Downs Drive and Mandy Lane extensions. (Amended Complaint, ¶ 28; Motion for Summary Judgment, ¶ 7). Zemenco refused to sign, noting that, although Paragraph 29 of the Agreement contemplated a future extension of Downs Drive, the Agreement did not mention Mandy Lane. (Amended Complaint, ¶ 30). Moreover, Zemenco feared that the envisioned extension of Mandy Lane would bisect the area immediately adjacent to Peach Street where Zemenco maintained its sales office and several model manufactured homes. (Id.)

On May 28, 1999, Diversified terminated the Agreement, asserting that Zemenco had defaulted on the Agreement by refusing to sign the REA. (Amended Complaint, Exhibit F). At that time, only the first of the $20,000 payments made by Diversified to the escrow account had been released to Zemenco.

On June 4, 1999, Diversified wrote a letter to the Summit Township Board of Supervisors requesting that the township condemn the portion of Zemenco's property necessary for the Mandy

Lane extension.  (Amended Complaint, Exhibit G).  Subsequently, on June 16, 1999, Summit Township unanimously adopted a resolution authorizing its solicitor to file a Declaration of Taking under the Eminent Domain Code so that the Mandy Lane extension could take place.  (Amended Complaint, ¶ 42; Motion for Summary Judgment, ¶ 11).  Zemenco's owner attended the hearing and, with assistance of counsel, unsuccessfully opposed the resolution.  (Motion for Summary Judgment, Exhibit H, Zafiropoulos Deposition, pp. 172-77).  Thereafter, Diversified completed construction on the Downs Drive and Mandy Lane intersection in accordance with the January 11, 1999 Development Agreement.  Zemenco received compensation of $287,000 for the land taken by the township.  (Motion for Summary Judgment, Exhibit H, p. 136).

On May 28, 2003, Zemenco filed a complaint against Diversified alleging that the latter had breached the Agreement and had acted in bad faith during the condemnation proceedings. Developers moved for summary judgment on January 14, 2005.  Following a response by Zemenco, oral argument on the motion was held on February 8, 2005.  During arguments, Zemenco expressed a desire to amend the complaint to add a claim of fraud in the inducement. We granted Zemenco leave to amend the complaint, and denied Diversified's motion for summary judgment without prejudice to re-assert the motion following discovery on Zemenco's fraud claim.  On March 2, 2005, Zemenco filed the Amended Complaint (Dkt. 25).[2]

Diversified filed the instant motion for summary judgment on April 7, 2005.  Zemenco responded on April 28, 2005, and Diversified replied on May 13, 2005.  A second oral argument took place on July 29, 2005.  This issue is thus ripe for resolution.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[2]     Because Diversified was not a party to the original Agreement between Scott's and Zemenco, Zemenco, in order to reach Diversified on the fraudulent inducement claim, also alleged that a conspiracy existed between Scott's and Diversified as to the purpose and formation of the Agreement.

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita, 475 U.S. at 587).

### III. DISCUSSION

#### A.    Fraud in the Inducement

Zemenco's amended complaint asserts that Diversified fraudulently induced it to enter into the Agreement by conspiring with Scott's to misrepresent Diversified's true intentions for the property to Zemenco. Specifically, Zemenco alleges that Scott's feigned interest in acquiring the property for development purposes when, in actuality, Scott's and Diversified sought the property solely to construct the Mandy Lane extension. Diversified contends that, even assuming *arguendo* that Zemenco could prove these allegations, Zemenco is barred from raising its fraud claims by the Pennsylvania statute of limitations.[3]

The statute of limitations in Pennsylvania for actions based on fraud is two years. 42 Pa.C.S.A. § 5524(7); Powell v. First Republic Bank, 274 F.Supp.2d 660, 677 (E.D. Pa. 2003). A cause of action for fraud accrues, and the two-year limitations period begins to run, when the "plaintiff learns or reasonably should have learned through the exercise of due diligence of the existence of the claim." Beauty Time, Inc. v. Vu Skins Sys., Inc., 118 F.3d 140, 148 (3rd Cir. 1997)

---

[3]        The Agreement contains a choice-of-law clause dictating that the terms of the Agreement be construed in accordance with Pennsylvania law. (Motion for Summary Judgment, Exhibit A, ¶ 27(A)).

(applying Pennsylvania law).  This so called "discovery rule" arises "from the *inability* of the injured, *despite the exercise of due diligence*, to know of the injury or its cause."  <u>Pocono Int'l. Raceway, Inc. v. Pocono Produce, Inc</u>., 468 A.2d 468, 471 (Pa. 1983) (emphasis in original) (cited by <u>Beauty Time</u>, 118 F.3d at 143-44).  "The question of whether a plaintiff has exercised due diligence in discovering his own injury is usually a question for the jury, <u>see</u> e.g., <u>DeMartino v. Albert Einstein Medical Center, Northern Div.</u>, 313 Pa.Super. 492, 460 A.2d 295 (Pa.Super.1983), but when it appears that no factual question has been presented, the court may conclude that the statute of limitations operates as a bar to the claim."  <u>State Farm Mut. Auto. Ins. Co. v. Midtown Medical Center Inc.</u>, 2005 WL 627969, *4 (E.D.Pa. 2005) (quoting <u>Noyes v. General Am. Life Ins. Co.</u>, 1998 WL 54347 (E.D.Pa. 1998)); <u>see also</u> <u>Cathcart v. Keene Indus. Insulation</u>, 471 A.2d 493, 502 (Pa.Super.1984) (overturned on other grounds).

All that is required to trigger the running of the statute of limitations is sufficient information to "awaken inquiry and direct diligence in the channel in which it would be successful."  <u>Bohus v. Beloff</u>, 950 F.2d 919, 925 (3d Cir.1991) (quoting <u>Deemer v. Weaver</u>, 324 Pa. 85, 90 (1936)).  Indeed, "a claimant need only be put on inquiry notice by 'storm warnings' of possible fraud."  <u>Ciccarelli v. Gichner Systems Group, Inc.</u>, 862 F.Supp. 1293, 1301 (M.D.Pa. 1994) (citing <u>In re Asbestos School Litigation</u>, 1991 WL 175848 at *3 (E.D.Pa. 1991)).

As it pertains to the present case, Zemenco contends that it remained ignorant as to Diversified's involvement in the Scott's/Zemenco negotiations until receiving discovery materials generated in connection with this lawsuit.  We conclude, however, that several "storm warnings" should have been apparent to Zemenco by, at the latest, June, 1999.  On November 20, 1998, only six days after signing the Agreement, Scott's transferred the Agreement to Diversified.  In January of 1999, Zemenco and Diversified disagreed as to whether the Agreement granted Diversified the right to a reciprocal easement over Zemenco's property.  Shortly thereafter, Diversified cancelled the Agreement and began petitioning Summit Township to condemn the strip of Zemenco's land where the Mandy Lane extension would run.  It is not disputed that each of these facts was known

to Zemenco; indeed, they eventually lead Zemenco to file this lawsuit in 2003.

Of particular significance is the short period of time between when Scott's and Zemenco signed the Agreement and when Scott's assigned the Agreement to Zemenco. A non-disclosure clause in the Agreement prohibited Scott's from disclosing or discussing the Agreement with any third parties, yet Scott assigned the Agreement to Diversified less than a week after signing.[4] Given the timing of this event, a reasonable party would have been alerted to the possibility that Diversified's interest in the Agreement pre-dated its signing. This factor, coupled with the subsequent quarrel over the reciprocal easement, cancellation of the contract, and condemnation petition should have been sufficient to "awaken inquiry and direct diligence in a channel in which it would be successful." Beauty Time, 118 F.3d at 149 (quoting Urland v. Merrell-Dow Pharmaceuticals, 822 F.2d 1268, 1273 (3rd Cir. 1987)); see also Bohus, 950 F.2d at 925; Deemer v. Weaver, 324 Pa. at 90. Thus, Zemenco's fraud in the inducement claim is dismissed as time-barred.


**B.    Breach of Duty of Good Faith Dealing**

The second count of the Complaint asserts that Diversified breached the general duty of good faith and fair dealing that attaches to the performance of every contract under Pennsylvania law. See, e.g., Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Cot. 1992). However, Pennsylvania courts have declined to allow for an independent claim of action for breach of the duty of good faith and fair dealing, instead noting that the breach of this duty should properly be brought as a breach of contract action:

---

[4]     The non-disclosure clause read:

> Purchaser has not and will not disclose or discuss this Agreement, nor its contents and parties, nor any aspect of the negotiations had between the parties hereto prior to or after the mutual execution hereof, to any third party . . . without the specific written permission of the Seller.

(Amended Complaint, Exhibit A, ¶ 9(B)).

> A breach of [the covenant of good faith and fair dealing] is a breach
> of contract action, not an independent action for breach of a duty of
> good faith and fair dealing . . . [and thus] separate causes of action
> cannot be maintained for each, even in the alternative.

JHE, Inc. V. SEPTA, 2002 WL 1018941, *5 (Pa. Com. Pl. 2002); see also Pennsylvania Business Bank v. Franklin Career Services LLC, 2005 WL 637456, *2 (Pa. Com. Pl. 2005); MRED General Partner, LLC v. Tower Economics Company, Inc., 2005 WL 957707, *1 (Pa. Com. Pl. 2005). As Zemenco has properly plead a breach of contract claim, Zemenco's good faith dealing claim is dismissed as redundant.

## C.     Breach of Contract

Zemenco's Amended Complaint asserts that Diversified breached the contract when Diversified declared Zemenco to be in default and terminated the Agreement on May 28, 1999. As previously discussed, Diversified's termination of the Agreement stemmed from Zemenco's refusal to sign a reciprocal easement agreement allowing Diversified to construct the Mandy Lane extension. However, Zemenco denies that it had any obligation to agree to the proposed reciprocal easement agreement or the extension of Mandy Lane. The relevant contractual provision, paragraph 29 of the Agreement, required Zemenco to "allow Purchaser, at any time after the date of mutual execution hereof, to construct an extension of Downs Drive over and upon a portion of the Premises subject to the parties' mutual approval of plans therefore. . .". (Complaint ¶ 29). Because this provision makes no mention of Mandy Lane, Zemenco denies that the contract obligated them to agree to an easement for the Mandy Lane extension.

It is unnecessary, however, that we address the merits of either parties' arguments insofar as they focus on the appropriate construction to be given to paragraph 29. This is because the Agreement contains a liquidated damages clause that provides as follows:

> If Purchaser defaults hereunder, Seller shall retain any of the Deposit
> then in its possession as full liquidated damages and Seller shall have
> no other recourse thereafter.

(Amended Complaint, Exhibit A, Section 20). Because we conclude, *infra*, that this provision is

valid and enforceable, it is unnecessary for us to determine which party, if any, breached the Agreement.[5]

Under Pennsylvania law, "a party that retains legally enforceable liquidated damages will be barred from seeking actual damages." Blue Mountain Mushroom Co., Inc. v. Monterey, 246 F.Supp.2d 394, 400 (E.D. Pa. 2002) (citing Carlos R. Leffler, Inc. v. Hutter, 696 A.2d 157, 162 (Pa. Super. 1997) ("[P]arties who agree to include a liquidated damages clause in their contract, and do so properly, cannot later claim entitlement to actual damages; rather, in keeping with the law of contracts, the parties must be bound by their bargain.")). 13 Pa. Cons. Stat. Ann. § 2718(a) states:

> **Liquidated damaged in agreement.** - Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

In the real estate context, Pennsylvania courts have noted that "[t]raditionally, a seller may elect to retain deposit money as liquidated damages pursuant to a contractual stipulation . . . insofar as the amount retained was the sum agreed upon." Olmo v. Matos, 653 A.2d 1, 4 (Pa. Super. 1994). A liquidated damages clause that limit a seller's recovery to those funds paid as a deposit or towards a purchase price will be upheld provided that the liquidated damage amount is not so large as to constitute an unenforceable penalty, Palmieri v. Partridge, 853 A.2d 1076, 1080-81 (Pa. Super. 2004), and the clause reasonably approximates expected loss at the time the parties enter into the contract, Leffler, 696 A.2d at 162. In the instant case, Zemenco, the seller, is the party challenging the liquidated damages clause; thus, there is no dispute as to whether the $20,000 retained by Zemenco was so large as to constitute a penalty. Rather, Zemenco asserts that the $20,000 in liquidated damages is unreasonable under the circumstances.

---

[5]     To wit: if Zemenco breached the Agreement by refusing to sign the reciprocal easement proposal, as Diversified contends, then Zemenco's own breach of contract claim clearly must fail. If, on the other hand, Diversified breached the Agreement, Zemenco cannot recover anything beyond the $20,000 deposit which it had already received from Diversified prior to the breach.

In support of this position, Zemenco argues that, as a result of Diversified's purported contractual breach, Zemenco has suffered actual damages in excess of $1,000,000. However, "once a court finds a legally enforceable liquidated damages clause, any evidence of actual damages is inadmissable under Pennsylvania contract law as irrelevant to the action." Blue Mountain, 246 F.Supp.2d at 400 (citing, e.g., Commonwealth v. Mitchell, 517 Pa. 203, 216 n. 2 (1987)). This rule governs even where actual damages exceed the liquidated damage amount retained. Id. ("Holding plaintiffs to the liquidated amount when a plaintiff alleges actual damages exceed liquidated damages mirrors the rule that the breaching party must pay liquidated damages despite the fact that actual damages may be lower."). Thus, we must focus on whether the liquidated damages clause was reasonable at the time the contract was signed, rather than on what actual damages may have resulted from the breach. See Leffler, 696 A.2d at 162.

We conclude that the liquidated damages clause in the Agreement is valid. Provisions such as paragraph 20 are common to real estate contracts and have been upheld by Pennsylvania courts. See Palmieri, 853 A.2d at 1081; Laughlin v. Baltalden, Inc., 159 A.2d 26, 29 (Pa. Super. 1960); Kraft v. Michael, 70 A.2d 424, 425-26 (Pa. Super. 1950). As noted in Laughlin:

> Real estate transactions, involving breaches in performance, are peculiarly within that class of cases where the measure of damages is difficult to ascertain. It is for that very reason that the practice has developed of inserting in sales agreements a sum certain, agreed to by the parties, as the amount which will be considered as compensation for a breach in performance. This may be the amount of the deposit or hand money, or it may be a sum in a lesser or greater amount, depending upon the consideration involved. Generally, we have held that where a purchaser repudiates an agreement of sale of real estate containing a provision for liquidated damages, the vendor is entitled to the sum agreed upon as liquidated damages.

Laughlin, 159 A.2d at 29 (citing Tudesco v. Wilson, 60 A.2d 388 (1948)).

Moreover, as discussed in Section D of this opinion, *infra*, the damages claimed by Zemenco resulted from Summit Township's condemnation of the property and the subsequent construction of Mandy Lane rather than from Diversified's cancellation of the contract. Indeed, the contract, by providing for periodic $20,000 payments to escrow, release of those payments to the seller after a

certain amount of time, and retention of those deposits by the seller in the event of a breach, contemplated precisely the scenario which occurred here: that one party's breach or failure to perform would invalidate the contract. That Zemenco did not foresee the damages arising from an intervening act, Summit Township's decision to condemn the necessary land for the Mandy Lane extension, does not obviate the reasonableness of the liquidated damages clause *at the time the contract was signed*. Indeed, Zemenco's counsel conceded this point at oral argument:

> THE COURT: Were you (Zemenco) damaged in any other way - - let me put it this way. Absent Developer's involvement, if you will, in securing the condemnation of the land necessary for the construction of the Mandy Lane, were you, by virtue of any other default by Developers, independent of their action in connection with the taking involved?
>
> MR. REIF: Under the terms of the agreement, your honor, if they had simply walked away and we had ended up with our existing business and the $20,000.00, we were not.

(Summary Judgment Transcript, February 8, 2005, p. 46). Finally, we note that each of the parties to this contract, including Zemenco, are experienced business entities that routinely engage in the purchase and sale of real estate. See, e.g., Wedner v. Fidelity Security Systems, Inc., 307 A.2d 429, 433 (Pa. Super. 1973) (concluding that a limitation of damages clause was not unconscionable after finding it "significant" that "both plaintiff and defendant are experienced, established business persons."); K & C, Inc. v. Westinghouse Elec. Corp., 437 Pa. 303, 308 (1970).

Zemenco also argues that the liquidated damages clause should not apply because "at the time Diversified entered into the Assignment for the Zemenco property with Scott's on November 14, 1998, it had no intention of honoring the terms of the Agreement between Zemenco and Scott's in order to purchase the forty-six (46) acre parcel in accordance with the terms of the Agreement . . .". (Complaint ¶ 47). However, as we noted *supra*, Zemenco's assertions of fraud are time-barred. Thus, because the Agreement is no longer susceptible to attack on the basis of fraud, the liquidated damages clause cannot be invalidated on this ground.

**D.    Proximate Cause**

11

Even if Zemenco were able to establish any of the claims discussed above, Diversified argues in the alternative that Zemenco cannot demonstrate that Diversified's actions proximately caused any of the damage. Under Pennsylvania law, a plaintiff asserting a claim of breach of contract or fraud is required to demonstrate that the damages suffered were proximately caused by the defendant. See Gruenwald v. Advanced Computer Applications Inc., 730 A.2d 1004, 1014 (Pa. Super. 1999) (holding that a plaintiff asserting fraud must show that their injury was proximately caused by reliance on the defendant's misrepresentation); Logan v. Mirror Printing Co., 600 A.2d 225, 226 (1991) ("In order to recover for damages pursuant to a breach of contract the plaintiff must show a causal connection between the breach and the loss"). Diversified argues that Zemenco's damages stem entirely from Summit Township's decision to condemn the necessary portion of land for the construction of Mandy Lane.

A review of the record supports this assertion. For example, the Amended Complaint is replete with references to the "disastrous" effect that the Mandy Lane extension would have on Zemenco's development plans:

> The extension of Mandy Lane to Downs Drive . . . would have the effect of cutting certain eastern portions of the Zemenco property in half. Even more important is the fact that this contemplated extension would bisect the area immediately adjacent to Peach Street where Zemenco maintained its sales office and various models of manufactured housing which were essential to its continued development of Peach Tree Place as a residential housing development and thereby make this portion of the Zemenco property unusable for those purposes.
> \*    \*    \*    \*    \*    \*    \*
> Zemenco refused to sign the proposed Reciprocal Easement and Operating Agreement for a number of reasons, which included the disastrous effect the proposed Mandy Lane extension would have on the continued development of Peach Tree Place.

(Amended Complaint, ¶¶ 27, 30). The Amended Complaint also comprehensively details the actions taken by Diversified in conjunction with the Mandy Lane extension before concluding that "[a]s a direct consequence of these improper actions, Zemenco has been damaged. . .". (Amended Complaint, ¶ 45). Finally, counsel for Zemenco conceded at oral argument that the damages suffered by Zemenco resulted primarily from the Mandy Lane condemnation proceeding. (See Summary

Judgment Transcript, February 8, 2005, p. 46).   Thus, it is clear from the Amended Complaint and the arguments contained in each parties' briefs and presented at oral argument that the damages sustained by Zemenco as a result of the Mandy Lane extension were proximately caused by Summit Township's decision to condemn the intersecting.[6]

Notwithstanding this conclusion, Zemenco asserts that Diversified is still liable for that damage because Diversified petitioned Summit Township to condemn the land in question, providing the impetus for the Township's action.   Developers responds by asserting that the Noerr-Pennington doctrine immunizes it from civil liability for exercising its right to petition the government.

The First Amendment of the United States Constitution grants parties the right to petition the government.   California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972). This right, which is applicable to the states by virtue of the Fourteenth Amendment, see Hague v. Committee for Indus. Org., 307 U.S. 496 (1939), extends to all departments of government, including administrative agencies, courts, and municipal bodies. Herr v. Pequea Township, 274 F.3d 109, 115 (3rd Cir. 2001) ("The First Amendment right to petition extends to all departments of government including administrative agencies and the courts.") (citations omitted) (abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. Of Warrington, 316 F.3d 392, 400 (3rd Cir. 2003)).

The Noerr-Pennington doctrine derives from the United States Supreme Court's holdings in

---

[6]     Zemenco's Brief in Opposition asserts that Zemenco suffered damages unrelated to the Mandy Lane extension in that Zemenco was prohibited by the Agreement from entering into new long-term leases with potential residents of the Peach Tree Place mobile home park.   Moreover, the Amended Complaint claims that Zemenco sustained "loss of sunk costs, costs of refinancing its indebtedness on the property and other losses and costs" unrelated to Mandy Lane.   (Zemenco's Brief in Opposition, Dkt. #34, pp. 10-11; Amended Complaint, ¶ 61). However, to the extent that Zemenco alleges damages that predate the Mandy Lane condemnation proceeding, those losses rooted in breach of contract were foreclosed by the liquidated damage clause, and those alleged under the fraud in the inducement claim are time-barred, as discussed *supra*.

Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) ("Noerr"), and United Mine Workers v. Pennington, 381 U.S. 657 (1965) ( "Pennington"), wherein the Court held that an individual is immune from liability for exercising his or her First Amendment right to petition the government. See Pennington, 381 U.S. at 669-70; Noerr, 365 U.S. at 137-38.  Although these rulings originated in the antitrust context, the Third Circuit and other circuit courts have extended the doctrine's application to other areas of the law.  See, e.g., Barnes Foundation v. Township of Lower Merion, 242 F.3d 151, 160 (3rd Cir. 2001) (noting that prior Third Circuit precedent gave no indication that "this principle of First Amendment immunity was not meant to have general applicability. . . ."); Herr, 274 F.3d at 116 ("principles relied upon [under Noerr-Pennington doctrine] not limited to antitrust liability").

Significantly, the Supreme Court has held that "there was immunity regardless of the defendants' motivations in waging their campaigns, as it recognized that the right of individuals to petition the government 'cannot properly be made to depend on their intent in doing so.'" Barnes, 242 F.3d at 159 (citing Noerr, 365 U.S. at 139).  Thus, the doctrine allows "parties [to] petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others." Tarpley v. Keistler, 188 F.3d 788, 794 (7th Cir. 1999). "While the right to petition conferred by the First and Fourteenth Amendments does not provide an absolute immunity from liability for actions based on petitioning activity, the Supreme Court has held that such liability cannot be imposed in the absence of a finding that the position taken lacked any reasonable basis."  See Schneck v. Saucon Valley School Dist., 340 F.Supp.2d 558, 573 (E.D.Pa. 2004) (citing Herr, 274 F.3d at 116).

While conceding the broad scope of the Noerr-Pennington doctrine, Zemenco nonetheless contends that the doctrine is inapplicable where the attempt to influence government action is a "sham."  The Third Circuit has indicated that this so-called sham exception applies where "the [petitioning activity was] without probable cause and primarily for a purpose other than securing the proper adjudication of [the] claim." Herr, 274 F.3d at 118.  Zemenco cites LeBlanc - Sternburg v.

<u>Fletcher</u>, 781 F.Supp. 261 (S.D.N.Y. 1991), for the proposition that "[t]he 'first amendment . . . may not be used as the means or the pretext for achieving "substantial evils" which the legislature has the power to control.'" <u>Id</u>. at 267 (quoting <u>California Motor Transp</u>., 404 U.S. at 515).

In <u>Fletcher</u>, the defendants were accused of petitioning for the incorporation of a village and the imposition of strict zoning rules in order to discourage and prevent Orthodox Jewish residential neighborhoods from developing in the community.  The district court, noting that "[d]iscrimination through the exercise of government power is illegal," concluded that the <u>Noerr-Pennington</u> doctrine does not protect a party petitioning the government to act in an illegal manner.  Asserting that <u>Fletcher</u>'s factual posture is "not too dissimilar to the present case," Zemenco urges this court to find that Diversified's actions in petitioning for and constructing the Mandy Lane extension constituted the type of "substantial evil[]" decried by the Supreme Court.  <u>California Motor Transp</u>., 404 U.S. at 515.

We find no similarity between the conduct proscribed in <u>Fletcher</u> and Diversified's petitioning activity here.  Zemenco does not contend that Diversified sought the Mandy Lane extension for a discriminatory purpose.  Further, it is difficult to conceive as to how an extension of Mandy Lane could be considered a "substantial evil" within the meaning of the aforementioned caselaw.  While we must accept Zemenco's allegations of damage to their property and business as true for purposes of this motion, the sham exception to <u>Noerr-Pennington</u> is not invoked simply because the petitioning activity "might harm the interests of others."  <u>Tarpley</u>, 188 F.3d at 795-96 (holding that a Republican committee chairman's actions in petitioning the state government to hire members of the Republican Party for open state administrative positions was protected by <u>Noerr-Pennington</u> despite the fact that it harmed the interests of non-Republican applicants for those positions); <u>Knology, Inc. v. Insight Communications</u>, 393 F.3d 656, 658 (holding that the right to petition the government generally extends even to situations where "the petitioning activity has the intent or effect of depriving another of property interests . . .").

Here, it is clear that Diversified's petitioning activities were not designed "as an

anticompetitive weapon," <u>PRE</u>, 508 U.S. at 61, "for a purpose other than securing the proper adjudication of [the] claim," <u>Herr</u>, 274 F.3d at 118, or as a "pretext for achieving 'substantial evils,'" <u>California Motor Transp.</u>, 404 U.S. at 515. Rather, Diversified sought to achieve through legitimate legislative means that which it could not achieve through contractual negotiations: the provision of additional ingress and egress to its business plazas. At least one court has held that a party's efforts to induce or facilitate a municipal body's condemnation of property are protected by the <u>Noerr-Pennington</u> doctrine. <u>See</u> <u>Oberndorf v. City of Denver</u>, 696 F.Supp. 552, 558-60 (D. Colo. 1988) (holding that <u>Noerr-Pennington</u> protected a party's efforts to condemn a parcel of private property as "blighted" in order to facilitate the construction of a shopping mall). Thus, we reject Zemenco's argument that Diversified's petitioning activities fall within the sham exception to <u>Noerr-Pennington</u>.

Zemenco's final argument against the application of <u>Noerr-Pennington</u> asserts that Diversified perpetuated a fraud on Summit Township while petitioning the Township to condemn the intersecting parcel. Specifically, Zemenco suggests that Diversified "misrepresented the terms of the Zemenco-Scott's Agreement" in the June 4, 1999 letter to the Township seeking condemnation. The relevant portion of the letter states that:

> Late last year, Diversified Developers Realty Corporation ("Developers Diversified") entered into an Agreement for Purchase of Real Estate with Zemenco, Inc. ("Zemenco") for the purchase of property owned by Zemenco that abuts Developers Diversified's existing Peach Street Square Phase II Shopping Center (the "Purchase Agreement"). The Purchase Agreement with Zemenco provided, among other things, that Developers would have the right to construct an extension of Downs Drive east of Peach Street, and a connective access roadway (known as "Mandy Lane") from the Downs Drive Extension north to the existing Mandy Lane.

(Amended Complaint, Exhibit G). Zemenco argues that the first sentence quoted above is inaccurate because the original agreement was actually between Zemenco and Scott's, and that the second sentence is inaccurate in that it misrepresents that the Agreement obligated Zemenco to allow the Mandy Lane extension. Cumulatively, Zemenco argues that these two sentences constitute such an egregious "fraudulent misrepresentation of fact" as to nullify the effect of the <u>Noerr-Pennington</u> doctrine. (Brief in Response, Dkt. #21, p. 17).

16

The Third Circuit, however, has declined to recognize an exception to <u>Noerr-Pennington</u> immunity where the petitioning activity includes a misrepresentation or fraudulent statement:

> The Supreme Court has not addressed how alleged misrepresentations affect <u>Noerr-Pennington</u> immunity or the sham exception to <u>Noerr-Pennington</u> immunity. In <u>PRE</u>, the Court explicitly declined to decide whether the sham exception to immunity would include situations where the litigant had perpetrated "fraud" or had made "other misrepresentations." <u>Id.</u> at 61 n. 6, 113 S.Ct. 1920.
>
> *   *   *   *   *   *   *   *   *
>
> We decline to carve out a new exception to the broad immunity that <u>Noerr-Pennington</u> provides. Rather, we will determine whether [defendant's] petition was objectively baseless under the Supreme Court's test in <u>PRE</u>, without regard to those facts that [plaintiff] alleges [defendant] misrepresented. If the alleged misrepresented facts do not infect the core of [defendant's] claim and the government's resulting actions, then the petition had an objective basis and will receive <u>Noerr-Pennington</u> immunity under the first step of <u>PRE</u>. While we do not condone misrepresentations in a judicial setting, neither will we deprive litigants of immunity derived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core of the litigant's . . . case.
>
> *   *   *   *   *   *   *   *
>
> If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of [the] petition.

<u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 168 F.3d 119, 123 (3rd Cir.1999) (citing <u>Music Center S.N.C. Di Luciano Pisoni & C. v. Prestini Musical Instruments Corp.</u>, 874 F.Supp. 543, 549 (E.D.N.Y. 1995)) (holding that defendants were entitled to <u>Noerr-Pennington</u> immunity for [petitioning activity] despite allegations of misrepresentations in the petitions because the defendants had an objective basis for filing the petitions).

As an initial matter, we doubt that the representations in the letter are sufficient to support a fraud claim in the first instance. The first sentence quoted above simply omits a reference to the Assignment. However, the legal effect of the assignment was to place Diversified in the same contractual position previously occupied by Scott's. If this is indeed a misrepresentation, it is certainly not material. The second sentence is simply a manifestation of Diversified's legal opinion as to the effect of Paragraph 29 of the Agreement, an opinion which Diversified maintains to this

day.   However, it is axiomatic that "[o]ne of the essential elements of fraud arising out of a misrepresentation is, that it must be of a fact, and not the mere expression of opinion . . .". Peck v. Stevenson, 1898 WL 4047, *3 (Pa. Super. 1897); Step-Saver Data Sys., Inc. v. Wyse Technology, 752 F.Supp. 181, 190 (E.D.Pa.1990), *rev'd in part on other grounds*, 939 F.2d 91 (3d Cir.1991).

Assuming *arguendo* that the letter contained fraudulent misrepresentations of material fact, they could not have affected the core of Diversified's petitioning activity.  Diversified has provided deposition testimony from Summit Township Supervisor Paul Dahlkemper indicating that the Township did not even consider the contract between Zemenco and Diversified in determining to condemn the intersecting parcel:

> Q.    Attorney Sennett again repeated that a contractual agreement between Mr. Scott and Mr. Zafiropoulos is not the issue here. Do you remember Mr. Sennett making that kind of observation?
>
> A.    Yeah, because I think I asked him for it.
>
> Q.    Do you agree with this observation?
>
> A.    Yes.
>
> Q.    Would it be fair to say that the basis for your vote approving the resolution [to condemn the property] was because the Township wanted Mandy Lane and Downs Drive to be developed as opposed to whether there was a contract between Scott['s] and Zafiropoulos?
>
> A.    Yeah, because I don't know anything about a contract between the two.  I can't remember one.

(Motion for Summary Judgment, Dkt. ##31-32, Exhibit J, pp. 32-33).  Thus, to the extent that the June 4, 1999 letter contained factual errors, Diversified has provided unrebutted evidence that those errors were not relied upon by the Township and, therefore, did not go to the core of the petitioning activity.  See Cheminor Drugs, 168 F.3d at 123 ("If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of [the] petition.").

18

**IV. CONCLUSION**

For the foregoing reasons, Diversified's motion for summary judgment is granted and this action is dismissed.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ZEMENCO, INC.,                          )
                                        )
                    Plaintiff,          )
                                        )
                    v.                  )          Civil Action No. 03-175 Erie
                                        )
DEVELOPERS DIVERSIFIED                  )
REALTY CORPORATION,                     )
                                        )
                    Defendant.          )

## ORDER

        AND NOW, this 7th day of October, 2005, and for the reasons set forth in the accompanying

Memorandum Opinion,

        IT IS HEREBY ORDERED that the Motion for Summary Judgment of Defendant

Developers Diversified Realty Corporation [Doc. No. 30] is GRANTED.  Accordingly, this action

is DISMISSED.

                                        /s/ Sean J. McLaughlin_____
                                        United States District Judge

cm: All parties of record. ___

20