IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZEMENCO, INC.,
    Plaintiff

    v.          CIVIL ACTION NO. 03-175 ERIE

DEVELOPERS DIVERSIFIED,
    Defendant

HEARING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Friday, July 29, 2005.

APPEARANCES:
    JOSEPH A. KATARINCIC, Esquire, appearing on
    behalf of the Plaintiff.

    CHRISTOPHER P. FURMAN, Esquire, appearing on

behalf of the Plaintiff.

W. PATRICK DELANEY, Esquire, appearing on behalf
of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 8:50 a.m., on

4    Friday, July 29, 2005, in Courtroom C.)

5

6          THE COURT:  All right, we're back again for round

7    two.

8          MR. DELANEY:  We are, your Honor.  Your Honor, this

9    is a motion for summary judgment that's essentially a renewed

10   motion for summary judgment.  In the first argument with regard

11   to this issue, we had raised a number of points.  First of all,

12   the contract in question has a limitation of damage clause.

13          And, secondly, we've raised the Noerr-Pennington

_____

14  doctrine, and argued that all the plaintiff's damages flow from

15  the condemnation, not from any other action.

16        THE COURT:  As a proximate cause matter?

17        MR. DELANEY:  That's right.  We've stated that we

18  think that plaintiff has admitted that in argument.  I think

19  there were some comments, some discussion made that could be

20  construed that way.

21        THE COURT:  All right.

22        MR. DELANEY:  When we finished the argument on the

23  last motion, the point was that there was a question about

24  whether plaintiff could argue that there was fraud in the

25  inducement from this contract.  The point that plaintiff


                                3


1  appeared to be making was that if it was fraud in the

2  inducement, then the limitation of damage clause would not

3  apply.

4        In addition to that, there was a question raised by

5  plaintiff as to whether my client had misrepresented certain

6  facts to the township supervisors, thus, essentially defrauding

7  the supervisors in their petition seeking a condemnation.  And,

8  your Honor --

9       THE COURT:  So as to avoid the effect of the

10  Noerr-Pennington doctrine?

_____

11       MR. DELANEY:  Your Honor asked me to concede that

12  would be the case, I said I don't know.  And I still haven't

13  found any case law that addresses that particular issue.  But

14  the important point is we went back to do further discovery to

15  see if plaintiff could create a prima facie case on either of

16  those points, and we would submit that plaintiff is not able to

17  demonstrate a prima facie case, that there is (a), fraud in the

18  inducement of the contract or (b), that there was some

19  misrepresentation made in petitioning the government or

20  petitioning the township for this condemnation.  I would point

21  out that the fraud in the inducement claim, even if plaintiff

22  prevailed on that, in our view would be a hollow victory.

23  Because the remedy for fraud in the inducement in this

24  situation would be restitution of whatever plaintiff may have

25  given Developers Diversified.  Plaintiff gave nothing to

4

1    Developers Diversified.  And, in turn, if they prevailed on the

2    fraud in the inducement claim, it seems to us if the contract

3    is void, they would have to return to us the $20,000 that they

4    have in hand.

5         THE COURT:  Let's do this.  Let's turn to the

6    sequence of arguments as they appear in your brief.  Your first

7    argument is that the fraud claims are untimely, statute of

8    limitations, and should be dismissed?

9         MR. DELANEY:  Right.

10        THE COURT:  As I understand it, it is essentially

11   your argument that perhaps earlier, but sooner, but certainly

12   no later than, for instance, the condemnation hearing

13   proceedings, that plaintiff would have been on actual or at

14   least constructive notice as to the defendant's very strong

15   interests in the extension of Mandy Lane?

16        MR. DELANEY:  Well, that's correct.  Let's just

17   take -- if we're going to talk about the claim of fraud or the

18   misrepresentation of the township supervisors.  Let's take that

19   issue first.  In June --

20        THE COURT:  Well, actually, let's do it this way.

21   As I see it, the claim relative to allegedly defrauding the

22   supervisors is an issue that runs to proximate causation in

23   some large measure.  What I'm talking about now is, I thought

24   you were talking about in your papers, is the underlying fraud

25   in the inducement claim.  As I understand fraud in the

5

1    inducement, it's a separate animal.  The fraud in the

2    inducement claim, and plaintiff's counsel can speak to it

3    himself, but as I understand it, when all is said and done, the

4    theory of his case is this.  That Developers was really the

5    power behind the thrown, so to speak, as this contract was

6    being negotiated.  And once the ball was handed off to them by

7    way of assignment within a few days of the contract having been

8    signed between Zemenco and Scott, that neither at that time nor

9    at any time prior thereto, did they have any intention of

10   utilizing that 4.25 or 4.26 acres of property, that's the fraud

11   in the inducement?

12        MR. DELANEY:  That's what the plaintiff's claim.

13        THE COURT:  Now, with respect to that aspect of the

14   fraud claim -- with respect to that aspect of the fraud claim,

15   you raise a statute of limitations defense, is that right?

16        MR. DELANEY:  We do.

17          THE COURT:  Tell me what is the event or what are

18    the events that would have triggered knowledge on the part of

19    plaintiff that that was your secret intention at the time of

20    the inception of the contract which would place that claim

21    outside the statute of limitations?

22          MR. DELANEY:  There is no such evidence.  But if

23    plaintiff claims --

24          THE COURT:  Well, that's the claim.

25          MR. DELANEY:  If plaintiff claims that we had no

6

1    intention to proceed, then plaintiff would have known that when

2    the condemnation action occurred.  But it's connected to the

3    condemnation.  All the events had unfolded by June of 1999.

4    Developers Diversified did nothing further, no additional

5    information has been obtained, and if plaintiff is making that

6    claim, they must have known what facts they base that claim

7    upon by June, 1999.

8          THE COURT:  Let me ask a factual as opposed to legal

9    questions.  What does the record reflect as to when -- was

10    Zemenco on notice, was Zemenco aware during the course of the

11    negotiations between Zemenco and Scott, that you were standing

12    in the wings and would be the immediate assignee of the

13    contract?

14         MR. DELANEY:  That's a question of fact.  There are

15    witnesses who would say that Mr. Zemenco was aware that

16    Developers Diversified had an interest in creating an

17    intersection at Downs Drive.  Mr. Zafiropoulos, on behalf of

18    Zemenco, would say he did not know.  That's a question of fact

19    as to whether he knew or didn't know, that DDRC, my client, had

20    some interest in the Scott-Zemenco transaction.

21         THE COURT:  Did your client draft -- did your client

22    participate on behalf of Scott in drafting the proposed

23    contracts?

24         MR. DELANEY:  Not on behalf of Scott.  I think that

25    Joan Allgood, who was with the general contractor, said she was


7


1    aware of the contract before it was executed, may have even

2    seen it.  And full awareness of what Scott was doing.

3         THE COURT:  Why was it -- what does the record

4    reflect as to this question; if Diversified was interested in

file:///A|/ZEMCO729.TXT

5   the property, why didn't Diversified negotiate, why was there

6   this two step?

7        MR. DELANEY:  Well, Diversified was also interested

8   in Scott's property that was adjacent to Zemenco's.  I know, I

9   recall from the deposition of Mr. Scott, who's been deposed in

10   this case, that he gave a long history of having talked to Mr.

11   Zafiropoulos and having been on relatively good terms with him.

12   So, Scott had a vacant piece of property that was immediately

13   south and adjacent to Zemenco.  When Scott goes in and acquires

14   the contract on the Zemenco property, and it is about the same

15   time that this assignment occurs of that contract to DDRC, DDRC

16   also enters into a contract to acquire Scott's property

17   adjacent to it, as if in one bundle.  And then my client

18   examined, they certainly had an interest in creating an

19   intersection in those parcels of property.

20        THE COURT:  What does the record reflect -- what was

21   your client's intention to do with 4.25 acres of property?

22        MR. DELANEY:  Develop further commercial strip

23   plazas, if you want to call them that.  As you may know, that

24   large parcel to the north of the Zemenco property has a Home

25   Depot.

8

1          THE COURT:  Is there record evidence of that?

2          MR. DELANEY:  Well, there is testimony to that

3    effect.  Joan Allgood testified to that fact.  There is a piece

4    of correspondence that is in the record but -- I'm sorry, I

5    don't think it's in the record in front of you right now, where

6    we reported to Mr. Zafiropoulos what progress had been made

7    with regard to examining what infrastructure needed to be put

8    in and things of that sort.

9          THE COURT:  So, from your standpoint, there's a

10   material issue, I'm not going to characterize it, there's an

11   issue of fact as to whether or not Zemenco was aware that you

12   were standing in the wings as a potential assignee, is that

13   right?

14          MR. DELANEY:  That's correct.

15          THE COURT:  All right.  Now, the contention is that

16   in 1997, in connection with the passage of this ordinance by

17   the township -- which envisioned the future extension of Mandy

18   Lane, was Developers instrumental in bringing that about?

19          MR. DELANEY:  I wouldn't characterize it as

20  instrumental.

21        THE COURT:  Well, did Developers -- whether you were

22  the primary instrument or merely importuned it, did you have

23  some input which in some measure brought that about?

24        MR. DELANEY:  Well, there is testimony, in fact,

25  there was a second supplemental record that was submitted to


9


1  our appendix recently, of the deposition of a Mr. Hessinger,

2  who was a township supervisor at the time of, very involved in

3  road matters at Summit Township, he was deposed in another

4  case.  And he talks about the discussions that were had with

5  Developers Diversified personnel about the need for an

6  intersection.  I think it's safe to assume that Developers had

7  some conversations.  Because one of the roads, this Mandy Lane,

8  really the vast majority of it is on Developers' land that

9  they're developing.  I think it's safe to assume that they were

10  in discussions --

11        THE COURT:  At that point in time, their interest in

12  the ordinance containing that possibility was driven by, and

13  nothing wrong with it, but was driven by the commercial

14  advantage to Developers?

15      MR. DELANEY:  Well, the desire of the township

16  supervisors was to have that traffic pattern --

17      THE COURT:  So it was actually a coalescence of two

18  mutually beneficial situations, it was important to the

19  township for traffic patterns, and coincidentally it was useful

20  to Developers given the lay of the land?

21      MR. DELANEY:  Literally.  In addition to that, you

22  may remember this from prior discussions, the township had

23  imposed some obligations on Developers Diversified.  For

24  example, it said we're not going to give you any more occupancy

25  permits until we see this traffic issue resolved.


10


1       THE COURT:  All right.  Now, let me ask you to do me

2  and primarily my new law clerk a favor.  Would you bring that

3  board over here, just set it up right in front there.

4       MR. DELANEY:  There's a map, if you're interested.

5       THE COURT:  I don't want to see a map, I just want

6  something roughly drawn that's easy to follow.  Sketch out for

7  our benefit exactly what we're talking about?

8          MR. DELANEY:  Well, let's start with Peach Street

9    running north and south.  And in a strange fashion I'm going to

10   give you north on the bottom of the easel.  This is Peach.

11   There is an existing road -- Peach is probably four or six

12   lanes wide, and there was at all times relevant to this an

13   existing road, we'll call it right up here, called Downs Drive.

14   I'll mark it with a "DD".  At the top running across would be

15   Interstate 90.  That would be south of the properties in

16   question.  And Mr. Zafiropoulos owned a piece of property, and

17   this is certainly not to scale.  But on the piece of property

18   that would have been something like this, and it was about 46

19   acres, I'll call it "Z".  Nick Scott owned the properties that

20   were immediately south of Mr. Zafiropoulos's or Zemenco's

21   property, it was really surrounded by two sides.

22          THE COURT:  You don't mean south?

23          MR. DELANEY:  This is south, the top is south.

24          THE COURT:  Well, if that is Scott, it looks like

25   he's to the immediate east of that?


11


1          MR. DELANEY:  He is, your Honor.  It is the neck of

2  the Zafiropoulos or Zemenco property, that really is the issue

3  here.

4          THE COURT:  All right.  That's the 4.25 acres?

5          MR. DELANEY:  I'm not sure of the exact acreage.

6  But this whole parcel is about 46 acres.  What's in question is

7  right in the neck.

8          THE COURT:  Okay.

9          MR. DELANEY:  The property here is Developers

10  Diversified.

11          THE COURT:  Immediately north of that property?

12          MR. DELANEY:  That's correct.  Then we have the Home

13  Depot, Circuit City, Petsmart.  The street that was in question

14  is right here, and it's Mandy Lane.  Now, at the time that the

15  contract was entered into in 1998, November of '98 --

16          THE COURT:  Just so I'm clear, put in where is -- I

17  presume the property there when you say Scott, that's the

18  property that formed the subject matter of the initial

19  contract, is that right?

20          MR. DELANEY:  No.  Let me walk you through that.  In

21  November of 1998, Scott enters into a contract with Zemenco to

22  buy this 46 acres, that includes this neck.

23          THE COURT:  Okay.

24      MR. DELANEY:  About a week after the contract is

25  dated, Scott assigns the contract to Developers Diversified.


12


1      THE COURT:  All right.

2      MR. DELANEY:  And Developers Diversified at about

3  that time also enters into a contract to buy four acres from

4  Scott right here.

5      THE COURT:  All right.  So the initial contract with

6  Zemenco and Scott for the 46 point whatever acres, that

7  contract within a day or two is assigned to Developers

8  Diversified?

9      MR. DELANEY:  Yes.

10      THE COURT:  What was the second component of that?

11      MR. DELANEY:  Well, just as an aside, this isn't in

12  controversy, isn't terribly relevant, at the same time

13  Developers Diversified entered into a contract to acquire Mr.

14  Scott's four acres right here.  Which we would say is evidence

15  that there was a genuine issue to try to develop the larger

16  parcel.  Now, what really is the dispute here is that the

17  township supervisors wanted Developers Diversified to develop

18  an intersection.  This is a private lane -- it wasn't public

19  property, Mr. Zafiropoulos I think has his home right back

20  here.  It was a private road that ran into there.  The township

21  traffic plan or transportation plan called for Mandy Lane to

22  come up to an imaginary street, as yet uncut street, and that

23  uncut street --

24        THE COURT:  Is that Downs?

25        MR. DELANEY:  Would be Downs Drive.  And Downs Drive

13

1  would connect to Mandy Lane.  And then they would literally

2  have a four cornered intersection.  And then they wanted

3  traffic lights on Peach Street right there.

4        THE COURT:  All right.

5        MR. DELANEY:  So that is what was discussed.  I

6  think your Honor's characterization of it is correct.

7  Developers Diversified had an interest in seeing that happen.

8  The township had an interest in seeing that happen.  Then the

9  issue of connecting these things is where the controversy

10  arises.  We asked, that is Developers Diversified, asked Mr.

11  Zafiropoulos on behalf of Zemenco, will you please give us a

12  reciprocal easement to connect these two roads.  Mr.

13  Zafiropoulos says no, because I perceive it will ruin my

14  property if you don't buy the rest of the property.

15      THE COURT:  Now, the use that was being made of Mr.

16  Zafiropoulos's property at the time, there was some mobile

17  homes, is that right?

18      MR. DELANEY:  And still are.  It's a mobile home

19  park.  In fact, there's a large ravine that bisects the

20  property.  But there's a fairly large mobile home park.

21  And Mr. Zafiropoulos or Zemenco indicates it also sold or it

22  had somebody else selling mobile home units up in this front

23  portion of the parcel.

24      THE COURT:  The reciprocal easement, show me again

25  what portion is encompassed by that?


14


1      MR. DELANEY:  It would be the dotted lines.  It was

2  Developers Diversified that asked Zemenco give us a reciprocal

3  lease.  The contract is pending at that time.  They said give

4  us a reciprocal easement that will allow us to develop this

5  Downs Drive and connect it to Mandy Lane.  They pointed, DDRC,

6    pointed to a clause in the contract.  Mr. Zafiropoulos says I

7    don't believe that clause gives you the right to demand this

8    from me.  And I'm worried that you're going to get that right

9    and walk away from the contract to buy.  They haggled, nothing

10   happened.

11        THE COURT:  Now, let me ask you about that.  We

12   talked about this at the last argument.  I think it's paragraph

13   29 of the agreement?

14        MR. DELANEY:  I think it is.

15        THE COURT:  What language in paragraph 29 of the

16   agreement fairly read contemplates the extension of Mandy Lane?

17        MR. DELANEY:  Well, it talks about Zemenco being

18   responsible for allowing the development of Downs Drive in an

19   easterly direction, to the extension -- I'm not quoting it

20   verbatim, but to the extended line of Mandy Lane.  I would

21   agree with you -- I would agree with plaintiffs, it doesn't say

22   plus you have to give us the right to extend Mandy Lane up.  It

23   doesn't say that.  That's why there was a disagreement on the

24   interpretation of that.  The contract does say, paragraph 29

25   does say that this right to an easement to extend Downs Drive

1  is part of the consideration for entering into the agreement.

2  And the gentleman from Developers Diversified said look, it

3  isn't contingent upon our buying everything else, you've given

4  us this right for entering into this option agreement with you.

5  And when they could not agree, that's when Developers

6  Diversified sent a letter to Zemenco saying we're terminating

7  the agreement on the 46 acres because you won't give us, under

8  the terms of the contract and because you won't give us a

9  reciprocal easement.  And then they walked over to the

10  supervisors and said would you please condemn this property.

11       THE COURT:  Now, so I'm clear, under the terms of

12  the contract, installment payments, if you will, were being

13  made on a periodic basis to the tune of about $20,000 a pop?

14       MR. DELANEY:  Yes.

15       THE COURT:  Is that right?

16       MR. DELANEY:  Yes.

17       THE COURT:  You had made three?

18       MR. DELANEY:  We had made three.  But the contract

19  had staggered payments.  They were paid into escrow.  And after

20  a period of time elapsed, the escrow agent released

21  installments to Zemenco.  And although we had paid three into

22  escrow, only one had been transferred to Zemenco, to the tune

23  of $20,000.

24      THE COURT:  All right.  This was all in anticipation

25  at some point of final --


                                16


1       MR. DELANEY:  Yes, of actually acquiring all of the

2  property.

3       THE COURT:  All right.  You can go back to the

4  podium.  So, now getting back to my original question as to the

5  event, and understanding your position that there was no fraud

6  in the inducement.  But assuming that it was your -- assuming

7  that it was Developers' intent never to acquire that property,

8  but simply to enter into this option agreement, if you will, as

9  a spring board to completing the Mandy Lane extension, what

10  event or events could have put them on notice that that was

11  your intention?

12      MR. DELANEY:  Well, when we presented them with the

13  reciprocal easement agreement and there was a disagreement

14  about it and we declared there was a termination.  Your

15  question presumes there is something else out there.  And I

16  can't think of anything, save the request for admission that I

17  was untimely in responding to.  And that's part of the briefing

18  that you have received.  There was a request for admission sent

19  to us and I was not timely in responding to it.  One of the

20  requests is isn't it true Developers Diversified had not, had

21  no formal plans to develop the 46 acres.

22      THE COURT:  Now, does the record show that -- and

23  this runs to the proximate cause issue, I guess.  Fairly read

24  does the record reflect that the township was dancing to

25  Developers' tune or Developers was dancing to the township's

17

1  tune?

2      MR. DELANEY:  I think -- I don't know if I can give

3  you a correct characterization, except to say this.  The

4  township was in control of occupancy permits.  And had indeed

5  announced that it would issue no further occupancy permits with

6  regards to this.  And when the township said we want road

7  improvements at the Downs Drive intersection --

8      THE COURT:  When you say occupancy permits, you're

9  saying they would issue no more -- they informed Developers

10  that they would issue no more occupancy permits on Developers

11  property until that intersection was done?

12          MR. DELANEY:  Correct.  Or that at least there was a

13  resolution to matters.  And when they said that they wanted to

14  signalize Downs Drive, they told Developers Diversified you'll

15  pay for it and they did.

16          THE COURT:  At the condemnation hearing, was Mr.

17  Zafiropoulos or his representatives there?

18          MR. DELANEY:  You're referring to the township

19  supervisors meeting?

20          THE COURT:  Yes.

21          MR. DELANEY:  Yes, he was there.  And since the last

22  argument, we've taken the deposition of, I want to say it's Mr.

23  Dahlkemper, who is no longer a supervisor, but was one of the

24  supervisors at the time.  Specifically asked Mr. Dahlkemper

25  whether Mr. Zafiropoulos on behalf of Zemenco was there.  He


                                    18


1  was.  Was he represented by counsel.  He was.  Did he have an

2  opportunity to speak.  He did.  Did Mr. Dahlkemper in voting in

3    favor of the resolution to condemn rely on any statement made

4    by Developers Diversified with regard to a contract arrangement

5    with Zafiropoulos or Zemenco.  Mr. Dahlkemper said no, I relied

6    on the fact that we wanted that intersection, and that counsel,

7    who was at my side at the meeting, told me that a contract was

8    irrelevant to what we wanted, we could do this.

9           THE COURT:  What does the record reflect as to

10   whether or not any representative of Developers at that hearing

11   made representations as to whether or not an extension of Mandy

12   Lane would or would not conflict with the terms of the private

13   contract?

14          MR. DELANEY:  I know that there was a Developers

15   Diversified representative there.  There are minutes of that

16   meeting.  I don't think that Mr. Dahlkemper testified to any

17   comments, but I don't remember what the minutes say.

18          THE COURT:  On what basis did Mr. Zafiropoulos

19   oppose the extension at the meeting?

20          MR. DELANEY:  I believe he said -- he has testified

21   in his deposition that he told the township supervisors that

22   this was some sort of rouse on the part of Developers

23   Diversified and they were taking advantage of him.  But, once

24   again, I can't quote you what exactly his argument was.  But he

25  did have an opportunity to speak and express his opposition.


19


1        THE COURT:  Now, let's talk about the

2  Noerr-Pennington doctrine.
_____

3        MR. DELANEY:  Yes.

4        THE COURT:  Is it your position that, only for the

5  sake of discussion, let's assume that that contract did not

6  contemplate this.  Did not give you the right to -- well, let

7  me put it this way.  Let's assume, contrary to what may be your

8  position, that the clear language of the Scott agreement did

9  not contemplate the extension of Mandy Lane, for purposes of

10  our discussion?

11        MR. DELANEY:  All right.

12        THE COURT:  And that consequently Mr. Zafiropoulos's

13  ire may have been justified when after the signing of the

14  contract, you folks go off and attempt to accomplish this.  Is

15  it your position that even in the face of a private contract

16  which might prohibit it, your petitioning is absolutely

17  protected?

18         MR. DELANEY:  Yes.

19         THE COURT:  Why?

20         MR. DELANEY:  I think the Third Circuit cases that

21  we've cited suggest that it's hard to imagine a situation where

22  there is not immunity in an instance where the transaction,

23  which is the lynch pin of the cause of action, is essentially

24  the exercise of the First Amendment right to petition

25  government.


20


1          THE COURT:  Is there a disputed issue of material

2  fact as to whether or not Mr. Zafiropoulos or Zemenco was on

3  notice of the 1997 ordinance -- that's number one; and if they

4  knew of the ordinance, what should they have known of the

5  ordinance, if anything -- what would the ordinance have told

6  them about this potential Mandy Lane train coming down the

7  track?

8          MR. DELANEY:  Well, the ordinance itself would have

9  described the anticipated intersection and development and

10  intersection of Mandy Lane and Downs Drive.  What I understand

11  Mr. Zafiropoulos complaining of is that the ordinance had not

12    been -- I'm sorry, the township's transportation maps had not

13    been brought up to date and that he couldn't see a map with

14    this intersection in place, although, the ordinance had been

15    passed.  And I guess ordinance, it is called the township

16    transportation plan, it's adopted, probably is a resolution

17    rather than an ordinance.

18         THE COURT:  I guess it's just because I have too

19    much information in my head, I'm getting fuzzy here.  But if

20    the ultimate idea was that your client would purchase that 46

21    point whatever acres and do with it as it saw fit, if that had

22    all come to pass, over what period of time would that have

23    taken place?

24         MR. DELANEY:  It would probably take more than 12

25    months, it would probably have taken -- you mean to actually


                                    21


1    open it to the public -- it would take a couple of years, I

2    would guess.  If we had, if Developers Diversified had decided

3    we got some tenants, the infrastructure is available, it's a

4    cost benefit, it works out for us, it will be profitable, the

5    contract had a series of steps.  I think quarterly payments of

6  $20,000 --

7        THE COURT:  What was the purchase price?

8        MR. DELANEY:  Pardon me.

9        THE COURT:  What was the purchase price?

10        MR. DELANEY:  It was about $4 million, I believe.

11  $3.9 million.

12        THE COURT:  All the while these periodic payments,

13  if you will, were being made, Zemenco remained on the property

14  doing business?

15        MR. DELANEY:  Correct.

16        THE COURT:  Okay.  My question is at what point in

17  time was it contemplated under the terms of the contract that

18  Zemenco would no longer be there and it would be your property

19  to use as you saw fit?

20        MR. DELANEY:  Judge, I don't have an answer to that.

21        THE COURT:  Why was Zemenco sitting on your

22  property?

23        MR. DELANEY:  Well, because I believe that everyone

24  viewed it really as an option, though, that word is never used

25  in the agreement.

22

1       THE COURT:  Did legal title ever pass?

2       MR. DELANEY:  No.

3       THE COURT:  In other words, it was an option to

4  purchase, in order to keep your option alive, you were making

5  periodic payments, is that right?

6       MR. DELANEY:  That would be my interpretation.

7  Although, I'll admit it doesn't say option in the agreement.

8  What it does say is look, you're going to make these quarterly

9  periodic payments, and then it has this catch-all limitation of

10  damages.  If purchaser, DDRC or Scott, if purchaser defaults,

11  you get to keep the payments that you have received.

12        THE COURT:  Now, finally, with respect to this

13  limitation of damages issue.  Which on its face appears to

14  restrict the damages that can be recovered under certain

15  circumstances to the amount of money that you've already put

16  in.  But only assuming for the sake of discussion that there

17  was fraud afoot here, how can it reasonably be said that a

18  limitation of damages provision could have been intended to

19  cover consequential loss?

20        MR. DELANEY:  If plaintiff were able to show there

21  was fraud in the inducement here, I think the contract is

22  voided.

23      THE COURT:  And your position is if there's fraud in

24  the inducement and the contract is voided -- actually, put it

25  this way.  Your position is as a matter of law your remedy for


23


1  a fraud in the inducement is the voiding of the contract and

2  you are precluded from recovering any consequential loss?

3      MR. DELANEY:  Well, you're precluded from getting

4  the benefit of the bargain.  If you look at the Restatement of

5  Contracts, it suggests that your remedy thereafter is

6  restitution.  You have a right to receive back that benefit

7  which you have conferred upon the party who allegedly has

8  fraudulently induced you into a contract.  There has been no

9  benefit transferred to Developers Diversified under this

10  contract.

11      THE COURT:  Do I take it, and plaintiff can speak

12  for himself, but is it your understanding that the problem with

13  Mandy Lane extension insofar as the plaintiff is concerned, is

14  that prior to that time he had a trailer park up there with a

15  private road, relatively sparsely used, except I presume for

16   inhabitants and visitors, and that after the Mandy Lane

17   extension, he was inundated with non-mobile home traffic?

18          MR. DELANEY:  He has never expressed that.

19          THE COURT:  Is that your understanding as to what

20   the nature of the problem was?

21          MR. DELANEY:  I have asked throughout --

22          THE COURT:  How has it diminished the value of his

23   land?

24          MR. DELANEY:  I don't know, it didn't, it made it

25   more valuable to me.  Fronting on an intersection controlled by

                                    24

1    a traffic light, it made it more valuable.  It did not diminish

2    the value of the land.  It didn't significantly -- there is no

3    proof that it significantly increased the traffic on that

4    stretch of land, it made it more valuable.  Plus, he was

5    awarded $287,000 in the condemnation proceeding once it was

6    commenced.

7          THE COURT:  All right, thank you.

8          MR. KATARINCIC:  Your Honor, Mr. Katarincic, on

9    behalf of plaintiff.

10          THE COURT:  Could I have the last name one more

11   time, please?

12          MR. KATARINCIC:  Katarincic, K-a-t-a-r-i-n-c-i-c,

13   sir.

14          THE COURT:  All right, very good.

15          MR. KATARINCIC:  Your Honor, if it's agreeable, I'm

16   going to proceed in terms of the issues that are raised and

17   discussed in the brief, I'm sure there will be questions.  The

18   statute of limitations that's been discussed here, in their

19   brief they say there are five things that should have been a

20   clue -- and I'll address the five quickly.  First, they said

21   the November 14th agreement of sale was assigned in a few days

22   to Diversified.  In and of itself there is nothing wrong with

23   that.  They have a right to do that.  So they did it.  They say

24   that in 1999 Diversified requested this reciprocal easement

25   agreement.  That's correct.  He refused to give it to them, on

25

1   the basis that they have no right under the agreement to it.

2   And they never were able to enforce that right in court.  If

3   they had such a right, they would have enforced it.  They did

4    file an action in the state court and let it drop when the

5    judge refused the injunction.  Number four, they said

6    Diversified petitioned for condemnation.  That is true.  And,

7    number five, that the township granted the condemnation.  Each

8    of those are permitted legal acts that they did.  We opposed

9    them, we were in disagreement with them.  Just because they

10   were doing these things that they're permitted to do, was an

11   irritant to us, doesn't mean we're now being told that the five

12   years there have been behind the scene dealings between

13   Diversified and Scott and so forth.  Well, of itself it wasn't

14   until 2004 when they took a bevy of depositions, the most

15   important deposition was the one of the senior counsel of

16   Diversified, who was an officer and who incidentally signed

17   practically every document here.  What did she tell us at that

18   deposition.  She said that the day before they signed the

19   agreement with Zemenco, they entered into an agreement with Mr.

20   Scott with respect to this very same land.  And one of the

21   issues laid down was Mandy Lane.  And they in their contract,

22   and the contract is exactly the same as 29 in her agreement,

23   but they asserted, carried the phrase to the effect saying that

24   Downs Drive shall, then they carry this in, to the eastern

25  right-of-way of Mandy Lane.  Now, they had a piece of paper

26

1  that said Mandy Lane --

2        THE COURT:  So what that shows is, as between

3  Developers and Scott, as they were putting together the papers,

4  there was a present intention on the part of Developers at that

5  time to extend Mandy Lane, correct?

6        MR. KATARINCIC:  Yes, it was the day before they

7  signed with Zemenco.  In the very same paragraph -- in the

8  Zemenco agreement they did not insert this word Mandy Lane.  So

9  they're dealing with one agreement and they said, and

10  Diversified said look, we want Mandy Lane, Mr. Scott, we got to

11  have that.  Mr. Scott said yes, we'll include that.  Not a word

12  in the agreement signed the next day identical phrase about

13  Mandy Lane.

14        THE COURT:  So would this be accurate to say.  You

15  did not know at the time that the contract was signed -- let me

16  ask you this.  Did you know that when the contract was signed

17  that Developers was really the real party in interest in the

18  wings?

19          MR. KATARINCIC:  No, we were actually told a Target

20  store was going to come in and build here, that's the

21  testimony.

22          THE COURT:  All right.  So you didn't know as of the

23  time that the contract was signed that Developers was in the

24  wings and, therefore, you didn't know as of that date that

25  Developers had an interest in the extension of Mandy Lane?


                            27


1          MR. KATARINCIC:  That's correct.

2          THE COURT:  But you did know in 1998 unequivocally

3  that Developers had an interest in the extension of Mandy Lane,

4  didn't you?

5          MR. KATARINCIC:  Yes, we did.

6          THE COURT:  Okay.  Why shouldn't the statute run

7  from at least then, what more did you need to know?

8          MR. KATARINCIC:  Just because Diversified wanted an

9  interest in Mandy Lane, wanted to acquire it and maintained

10  they had a contractual right to, there was a disagreement, that

11  doesn't mean there was any element of fraud, misconduct

12  involved in the transaction.  We were being told they think

13    we're entitled to it.

14        THE COURT:  Articulate for me this.  What is the

15    essence of fraud in the inducement, fraud in the inducement can

16    occur in one or two ways.  It can occur either by way of

17    omitting a material fact or including a misstated material

18    fact; what was the essence of the fraudulent inducement here?

19        MR. KATARINCIC:  It was omission.  There are three

20    pieces to it, if I could.  Three different occasions.  Number

21    one, when the transaction was signed out by Mr. Zemenco,

22    everything was indicated to him that there is a full formal

23    plan to go forward with the development.  Now, we took the

24    deposition of Ms. Allgood.  She said there wasn't such a thing,

25    this was in 2004.  In their brief, in their late admissions


28


1    answer I'll forget about that --

2        THE COURT:  I'm not quarreling about that.

3        MR. KATARINCIC:  I've been around too long not to

4    worry about that stuff.  But, anyhow, she said that we were

5    contemplating something or we wouldn't have acquired it.  We

6    have nothing specific in mind what to do.  They answer the

7    issue about that, we said you have no formal plan, they denied

8    that.  Then they chided me by saying don't you read Ms.

9    Allgood's testimony, in their brief.  She said what they were

10   contemplating.  They took out three words and when you go to

11   the depositions, and I assumed we were going to do something.

12   So that is the number one item.  That they had a plan to go

13   forward to develop this particular piece of land.

14        THE COURT:  So to characterize it slightly

15   differently, but I think functionally the same, what you're

16   saying is the fraud was they entered into an option agreement

17   to purchase your property with no intention of ever ultimately

18   purchasing your property, is that what you're telling me?

19        MR. KATARINCIC:  I will agree with you, but in

20   deference to the court, I would not agree with the word option,

21   I don't think that is important, it was not an option

22   agreement.  It was an agreement to buy and sell.  They made

23   periodic payments against the sales price, at the end they have

24   the right to walk away.

25        THE COURT:  When was title supposed to pass under

29

1    this agreement?

2         MR. KATARINCIC:  At the closing, which was

3    contemplated in 12 months, they used 365 days.

4         THE COURT:  All right.  So the $20,000 would be paid

5    monthly?

6         MR. KATARINCIC:  I think it was quarterly, some

7    periodic period of time.

8         THE COURT:  Well, was it anticipated at closing, at

9    which time title would pass, would only occur after the

10    payment, after the preliminary payment of X amount of money?

11         MR. KATARINCIC:  They could have accelerated it any

12    time they wanted to.  They could have closed before the first

13    payment was due, before the second payment was due, they had

14    that option to do that.  It's when are we going to close, what

15    date.  They never did close, of course.  So that all of the

16    payments really were payments towards the purchase price.  They

17    had this unusual feature, I don't understand it, of saying

18    well, if we walk away, all you do is keep the money that you

19    had paid to date.

20         THE COURT:  But this is true, isn't it, whether you

21    want to characterize it as an option agreement or not, it

22    served the same function because it kept other buyers at bay as

23  long as they were periodically paying the price?

24        MR. KATARINCIC:  Precisely, your Honor.  And they

25  were tying up this property while they were off on their other

                                30

1  activities.

2        THE COURT:  Just as an aside, during the period of

3  time that these payments were being made, did other suitors

4  come around to Mr. Zemenco's property, ready, willing and able

5  buyers that were interested in the property and perhaps would

6  have purchased but for the existence of this agreement, however

7  we would characterize it?

8        MR. KATARINCIC:  I know the answer to that question

9  is not of record, I can't point to the record.  I think I've

10  answered your question.

11        THE COURT:  Now, let me ask you this.  Let's talk a

12  little about the damage aspect of the case.  And before we do

13  that, could you bring me up to speed as to whether there have

14  been any further developments on the condemnation aspect of

15  this?

16        MR. KATARINCIC:  No, I have retained -- there was no

17  expert, I have now retained an expert, Mr. Ludelli from

18  Pittsburgh, who is going to be an expert in both the

19  condemnation and the damages in this case.  He's prepared to

20  proceed.  I met with him three or four times and my client has.

21  He's very skillful, I've used him in other cases, he's my

22  expert on this.

23      THE COURT:  Articulate for me how you were damaged

24  by the extension of Mandy Lane and what the nature of your

25  damages are?

31

1      MR. KATARINCIC:  I'll predicate my answer by saying

2  that where you have a voidable contract, that's what this is,

3  is not voided, it's voidable, Mr. Zemenco had the opportunity

4  to walk away if he wanted to, if there was fraud in the

5  inducement.  Now, when you have a voidable contract and the

6  party that can take advantage, can invoke the fraud, has the

7  option of voiding the contract or leaving the contract.  Now,

8  when you do the latter, you have what the restatement calls

9  recoupment.  You're entitled, Mr. Zemenco's company is entitled

10  to any benefit that was conferred on the defendant Diversified

11   as a result of its fraudulent conduct.  Now, what was the

12   benefit that was conferred.

13        THE COURT:  Let me stop you for a second, I'm going

14   to let you tell me that because I'm interested in that.  But I

15   want to flip it.  What detriment did Mr. Zemenco incur to his

16   trailer park and his prospects for future profit as a result of

17   what apparently was an improvement from a dirt road to a paved

18   road?

19        MR. KATARINCIC:  Two major problems.  Number one,

20   they went right through the heart of his business and split it.

21   Number two --

22        THE COURT:  Can you show me, I know you can't get up

23   here --

24        MR. KATARINCIC:  Can I have my associate show you.

25        THE COURT:  That's what you have your associate here


32


1   for.

2        MR. FURMAN:  Christopher Furman, your Honor, for

3   Zemenco.  If I could clear this up a little bit.  Downs Drive

4   actually goes all the way this way, turns up here like this.

5  This might make it a little bit easier.  And this little parcel

6  down here is not an issue, that's a car lot.

7          THE COURT:  All right.

8          MR. FURMAN:  Before Mandy Lane was put in there, Mr.

9  Zemenco or Mr. Zafiropoulos had a sales office and mobile homes

10  and some other model homes in this area, and his home he lived

11  in.  When Mandy Lane came through, this is approximately two

12  acres --

13          THE COURT:  What was up there?

14          MR. FURMAN:  This was actually split in two parts.

15  There were thirty-nine trailer homes here in this first half.

16          THE COURT:  Were those occupied?

17          MR. FURMAN:  They were occupied.  The second half of

18  the 46 acres was planned to be another 200 homes.  Now, when

19  Mandy Lane came through, and this is what Mr. Katarincic was

20  explaining, when he cuts through the heart of the business, he

21  takes away the sales office, the mobile homes for view and the

22  frontage on Peach Street.  This is the important piece of

23  property for a mobile home park, the frontage on Peach.  Not

24  frontage on an access road to a mall, so to speak, or to Home

25  Depot.  People who were going to drive over to Home Depot

33

1  aren't interested, you got thousands of people driving there

2  versus shoppers going to Home Depot.  This is the important

3  part of the business for --

4          THE COURT:  When you say frontage, what do you mean?

5          MR. FURMAN:  The portion of the property that abuts

6  or goes right up to Peach Street, this part right here.  Where

7  the model home was.  And then the sales office, which was right

8  on the other side of the car lot.

9          THE COURT:  For the passerby before the extension of

10  Mandy Lane, what would one have seen by way of frontage if you

11  looked as you were going passed the dirt road?

12          MR. FURMAN:  A modular home.  A prefabricated, I

13  think they're called manufactured homes, is what the term is.

14          THE COURT:  So there was a sales office and there

15  was a handful of exemplars?

16          MR. FURMAN:  Yes.

17          THE COURT:  Okay.  And then in the back is where the

18  folks were actually living?

19          MR. FURMAN:  Yes.  This is Downs Drive here, I think

20    it turns to Buffalo, turned over to the right and extended this

21    way to get to the rest of the development.  And the future

22    development of the trailer, of the development area,

23    contemplated this road extending back here further.  There was

24    a gully here, which is why this was done in two phases.  This

25    road that went over the gully included the back half or another

34

1    200 lots.

2             THE COURT:  The income that was being generated on

3    the mobile home park, of course, was being generated by virtue

4    of the rents that the folks back there were paying, is that

5    right?

6             MR. FURMAN:  Well, there's two parts to it.  This is

7    another reason why it goes to the heart of the business we're

8    talking about.  We're going to have an expert on this matter,

9    too.  For, particularly manufactured home lots, there's two

10    portions of it.  The owner owns the land and then he sells

11    homes and then leases the spot for the home to be put on.  So

12    as people buy their homes, put them there, move out, they put

13    more people in, all that activity happens here in the sales

14  office.  It's not just once you sell a home, it's going to be

15  there for 35 years, you have the land and --

16         THE COURT:  Are these movable homes?

17         MR. FURMAN:  They're manufactured homes, they're

18  pre-made somewhere else and brought in.

19         THE COURT:  Folks own the home, he owns the land?

20         MR. FURMAN:  Yes.

21         THE COURT:  So they're leasing the land?

22         MR. FURMAN:  Yes.  So there's two portions of it.

23  Just to finish your question there.  What you have is a rate,

24  you have an occupancy rate which is what you do, once you have

25  this filled up, you make money from the occupancy.  You also


35


1  have another way of making money from selling homes.  In

2  addition to selling homes for sale on his own lots, Zemenco

3  could sell homes to be put on anybody else's lot from the same

4  sales office.

5         THE COURT:  What do you mean they could be put on

6  anybody else's lot?

7         MR. FURMAN:  In other words, your Honor, if you were

8   driving down Peach Street and you saw a manufactured home on

9   the corner.  You go in there and buy it, you could put it on

10  anywhere else you could put a manufactured home.  Another

11  trailer park, for instance.  If you had like a double wide, the

12  extra features that they didn't offer at another park, you

13  could buy this home at this park or from Zemenco and take it to

14  another park.  So you have the sales office for just selling

15  the homes, you also have an income coming in from the

16  occupancy.

17          THE COURT:  This may be a stupid question, but

18  recognizing that -- characterizing, if you will, the office

19  that existed on the previous dirt road, as kind of the nerve

20  center for the operation and the mobile homes just being an

21  example of what was produced by the office, why couldn't you

22  just move the office several hundred feet in the opposite

23  direction, set up shop there and accomplish the same purpose?

24          MR. FURMAN:  When you say the other direction, do

25  you mean this direction?


                              36


1          THE COURT:  Yes.

2          MR. FURMAN:  We have an expert that will talk about

3   that.  The most important part of the home is the exposure to

4   the traffic.  There's a particular demographic that

5   manufactured homes are marketed to.  If the sales office and

6   the model home --

7          THE COURT:  Do you mean if the people passing by

8   can't see the mobile home, they won't know they're there?

9          MR. FURMAN:  They won't know they're there, they

10  won't buy it.

11         THE COURT:  Well, they can't buy what they don't

12  know.  So, basically, this all boils down to, they got moved

13  away form the street, so the public passing by would be unaware

14  that there was (a), a mobile home park back there and (b), that

15  there was an opportunity to either lease mobile homes there or

16  buy mobile homes someplace else, or buy mobile homes there or

17  put them someplace else, is that what you're saying?

18         MR. FURMAN:  Correct.

19         THE COURT:  That's the damage you're talking about?

20         MR. FURMAN:  That is the damage.  And that damage

21  resulted in the diminution of this property because the

22  occupancy rate and the fill rate fell.  The fill rate fell

23  because it would take longer to fill it up, your Honor, once

24  it's filled up, it's hard to keep the occupancy.

25      THE COURT:  So you're saying the occupancy rate

37

1  didn't fall because the occupants didn't like the fact that

2  they had a nice new paved road rather than a dirt road, the

3  occupancy rate fell because when those people in the normal

4  course of things moved out, it was more difficult to find

5  people to move in?

6      MR. FURMAN:  Correct.

7      THE COURT:  All right.

8      MR. KATARINCIC:  Your Honor, the question you posed

9  was posed by Diversified, the very question you asked.  And the

10  person who negotiated the contracts for both Diversified and

11  answered it in a letter, which is in the appendix, a letter of

12  April 14, 1999, to Diversified, their lawyer, it's on page two,

13  the question was asked and here was the answer.  "This is

14  Andy's worst nightmare.  Because it would in fact subdivide his

15  property by virtue of the street going through and destroy it."

16  That's what they told Diversified as they were discussing Mandy

17  Lane.  So they answered the question, they were aware of it.

18  To continue on, your Honor, in 2004 we took a series of

19  depositions.  We found out that Diversified at no time

20  whatsoever, in spite of what my colleague here says, they

21  didn't know what they were going to do.  They really wanted to

22  get into that Phase II property.  Nobody ever told a Zemenco

23  representative a word about this.  As I said, I read all the

24  depositions.  I'm trying to say what's behind this.  There was

25  one thing behind this.  They had to get a piece of paper,


38


1  absent an agreement from Andy, they had to get a piece of paper

2  that said Mandy Lane on it.  It was that piece of paper that

3  they took to the commissioners, and the commissioner testified,

4  which I just found the other day and filed with the court, that

5  if we did not have that agreement, which was represented to us,

6  required Andy to give them the Mandy Lane access, we wouldn't

7  have gone forward with this.  And he so testified, that's Mr.

8  Hessinger.  Very important, I filed it yesterday.  So that that

9  particular fact we didn't know about until we got into this

10  discovery.  Here was their other plan.  They didn't have that

11  Mandy Lane in the agreement with Zemenco.  In the Court of

12    Common Pleas down here, when they tried to get an injunction,

13    their argument was, it's on the record and in their brief,

14    look, judge, this was really one agreement.  It's true we

15    didn't put the word Mandy Lane into Zemenco's agreement, but,

16    you know, this is all one agreement, all these papers are

17    together.  They were so concerned with affirming what they did,

18    of course, the judge rejected that, these are two separate

19    transactions.  So they know that what they did by insertion of

20    that Mandy Lane gave the wrong false message to everybody.

21          THE COURT:  When they came to you and attempted to

22    negotiate it, made a proposal to negotiate a reciprocal

23    agreement that would have included this Mandy Lane, with

24    respect to Zemenco, did Zemenco at that time attempt to

25    renegotiate the purchase price?


39


1          MR. KATARINCIC:  No.  I think he simply opposed

2    giving them that right of way because it said you're going to

3    destroy my property, my business.  I'm here anticipating that

4    you're going to close on this whole transaction and that Target

5    is going in, as you told me.  He did not try to skim them for

6   any more money.  The one interesting question you posed it,

7   then we got off on a side track.  Damages.  My friend here says

8   that there is no damages because the contract is void and

9   here's your back whatever, we all go home, you're happy.  That

10   is not the law.  The law is that where one party has been the

11   victim of fraud in the inducement, a misrepresentation, he has

12   damages, even though the contract's voided, no longer exists,

13   the restatements have said that he has damages, is entitled to

14   any benefit that was conferred upon the other side and which

15   was acquired because of the fraud.

16         THE COURT:  What would those be?

17         MR. KATARINCIC:  Let me answer that.  What benefit

18   was acquired.  Judge, when all this is done, the issue was this

19   portal into that Phase II shopping center, how do we get in

20   there.  They needed that Mandy Lane.  The township said you

21   don't have Mandy Lane, if you don't have an opening, we are not

22   giving you any occupancy permits.

23         THE COURT:  Any more occupancy permits?

24         MR. KATARINCIC:  They only had one.  We're not going

25   to give you one for all these other stores you have lined up.

1  So, therefore, by virtue of their conduct in going to the

2  municipality, as the commissioner said, telling us they had a

3  contract, and because of that we went ahead and passed this

4  ordinance, which I'll address in a minute --

5        THE COURT:  Are you saying that they defrauded the

6  township supervisors by misrepresenting what they were legally

7  entitled to do?

8        MR. KATARINCIC:  I'm not going to say defrauded,

9  they made an assertion that was false --

10       THE COURT:  What is this false assertion they made

11  at the condemnation hearing proceeding?

12       MR. KATARINCIC:  You mean in the proceeding to get

13  the decision to take?

14       THE COURT:  Yes, that's what I meant.

15       MR. KATARINCIC:  What he said was -- Mr. Hessinger,

16  we wouldn't have done this, we wouldn't have approved this.

17       THE COURT:  Mr. Hessinger for the record is a

18  supervisor?

19       MR. KATARINCIC:  Yes, sir, he was for many years.

20  He says here on page 13 of his deposition, which I filed, we

21  signed the agreement, we were told it was represented that they

22  entered into an agreement with Zemenco, that's his client, to

23  put in the roads, otherwise, we would have never agreed to this

24  condemnation.  And their point was, Andy, you agreed to do it,

25  according to Diversified, and you didn't do it.  And they're


41


1  very upset.  The other commissioner, as he testified, was very

2  upset with Andy, we're not going to cut him any breaks, we're

3  going to proceed.  On page 13 to the top of 14, he says well,

4  beside the agreement dated February 17th, we were told that

5  they entered into an agreement with Zemenco, Inc., to put in

6  the roads, plural, in, otherwise, we would have never signed,

7  never agreed to this.  So my point is I think I can show the

8  jury that this action by the municipality in going forward and

9  apparently passed in and the decision to take the land, was

10  based on misrepresentation that was given to them by Zemenco.

11  To continue on the damage issue, all of the benefit -- by

12  virtue of them taking this vista, this walkway into Phase II,

13  as my expert's telling me, there was immense benefit acquired

14  by virtue of that.  That would be my recoupment.  The

15  restatement says I can recover benefit conferred as a result of

16  their fraudulent conduct.

17        THE COURT:  So, let me get this straight.  The

18  damages that Mr. Zemenco may have sustained with respect to the

19  diminution in value, better stated, the loss of profits on his

20  trailer park, are really the tail on the damage dog; the

21  damages you're looking for is you want to stand in the shoes of

22  Developers and reap the benefit or profit of what they have

23  been acquiring low these many years on their parcel, is that

24  what you're telling me?

25        MR. KATARINCIC:  By virtue of their fraudulent

42

1  conduct, what was the value of that land at that point in time

2  considering all the potential occupancy.  I'm not talking about

3  futura, I'm saying as the value to that land --

4        THE COURT:  How do you cut if off then?

5        MR. KATARINCIC:  Well, that is what my expert is

6  working on now.  He thinks you determine that value at a point

7  in time when Mandy Lane was taken.  And some may say that land

8  by virtue of their having the portal into the shopping center

9   is not worth $10 rather than $5, which you don't try to collect

10  future rents, that simply may have a bearing on the present

11  value of that land.

12          THE COURT:  All right, we're going to take about a

13  three-minute recess.

14          (Recess from 9:56 a.m.; until 10:02 a.m.)

15          THE COURT:  All right, where were we?

16          MR. KATARINCIC:  The damages.  I think I essentially

17  covered that.  That is in effect by this fraudulent conduct

18  they took from us a very valuable area, Mandy Lane.  Your

19  Honor, that was in their minds from day one.  Your Honor, this

20  agreement with Andy was closed in November of '98.  I found in

21  their documents, which is in the record before you, they had

22  the assignment prepared in September, September of that year,

23  well before Andy ever signed up.

24          THE COURT:  Why isn't Nick Scott a defendant in this

25  case?

43

1           MR. KATARINCIC:  I'll answer your question, I asked

2   the same question, I thought that he was one of the

3   conspirators.  It's not essential --

4        THE COURT:  The whole claim here is that there has

5   been collusion between Scott and Developers?

6        MR. KATARINCIC:  Your Honor, my first question and I

7   don't want to put it this way, but to my predecessor was why

8   didn't you sue Scott, because he was part and parcel of this

9   whole scheme.  The answer was well, I don't like to sue other

10  people --

11       THE COURT:  Well, I'm not suggesting that he should

12  or should not have been, I'm simply observing the record and

13  the nature of the allegations.

14       MR. KATARINCIC:  As I would have observed, I would

15  have sued him.  But that's water over the dam.

16       THE COURT:  All right.  Noerr-Pennington -- go

_____

17  ahead.

18       MR. KATARINCIC:  May I correct one thing I said, I

19  may not have been very clear.  The testimony of Mr. Hessinger

20  with respect to he wouldn't have acted unless he had been told

21  there was an agreement with Andy to build the roads, plural.

22  That was in connection with obtaining the passage of the

23  ordinance.  That ordinance then was used as a basis for going

24  forward with the condemnation.  So his testimony was we passed

25  the ordinance based on what is really a false statement.  Then


44


1  from the ordinance, they used it as a basis for condemnation.

2  You asked one question what did this ordinance say.  I haven't

3  put the eyeshade on to read this and figure it out.  Here's the

4  only language in the ordinance at all.  Section one of this

5  ordinance.  It's not a resolution, it's an ordinance.  "The

6  easterly local commercial street which runs in a north-south

7  direction to future Downs Drive extension, east of Peach

8  Street, is hereby eliminated."  That's one.  "The westerly

9  local commercial street is changed to a marginal access street

10  and relocated from Commons westerly to Mandy Lane."  All they

11  did in this was abandon in effect one that they had planned and

12  put it into another.  The commissioner, who was there at the

13  time, Commissioner Sterrett, in his deposition, page 42 to 46,

14  says he was testifying in November, '04, that the agreement

15  would have provided -- this agreement here, this ordinance

16  here, provided Zemenco with no information about Mandy Lane

17  even if had reviewed, even if you had reviewed the

18  transportation plan because Mandy Lane did not appear on the

19  plan.  Your Honor, if I could back up.  Every once in a while

20  you see one little fact that you deal with in a case and say

21  that's a very critical fact.  Let me continue with the lawyer,

22  Ms. Allgood.  They told you on November 15th he drafts an

23  agreement --

24       THE COURT:  Ms. Allgood again for the record was?

25       MR. KATARINCIC:  She was a senior general counsel of

45

1  Diversified and a senior officer who signed all the agreements.

2  On November 15th she does a written agreement -- interlineating

3  the word Mandy Lane.  The next day the agreement with Zemenco,

4  no Mandy Lane.  We asked her why did you put Mandy Lane in the

5  Scott agreement and not in the Zemenco agreement, her answer

6  was because --

7       THE COURT:  I don't know what you mean, the Scott

8  and Zemenco agreement are one in the same thing?

9       MR. KATARINCIC:  They're two different things.  I'm

10  sorry, judge, I apologize.  There was, on November 15th there

11  was this development agreement between Scott and Diversified.

12  The next day Zemenco signs a deal with Scott to sell the real

13  estate.  In the November 15th agreement, she inserted this

14  phrase Mandy Lane.  She didn't do it in the Zemenco agreement.

15  But she said herself in deposition we were involved in not only

16  drafting it, but in the terms of the Zemenco deal because,

17  obviously, if they were going to take the property over, they

18  wanted to know what the terms were.

19        THE COURT:  Why did she say it was deleted from the

20  other agreement?

21        MR. KATARINCIC:  It wasn't deleted, it wasn't put

22  in.

23        THE COURT:  Why did she say it wasn't put in?

24        MR. KATARINCIC:  Because she said in the Zemenco

25  agreement, you have the word transportation plan.  Well, then


46


1  it was pointed out to her the Scott plan had the same words as

2  in the transportation plan and that brought a major stutter to

3  the whole thing.  The word she's using to -- whether she was

4  belt and suspendering it in the Scott, I don't know, but why

5  was she belt and suspendering it with Zemenco.  They did not

6   want Zemenco to know what their ultimate plan had to be.  But

7   the moment he had heard the fact that there was scheming or

8   dealing to get their hands on Mandy Lane, this was a whole new

9   deal.  They didn't want him to know it.

10        THE COURT:  Now, let's talk about two things.  First

11   of all, let's talk about the Noerr-Pennington doctrine.  Now,

_____

12   that is a very forgiving doctrine in terms of a citizen's

13   ability to petition the government for this and that.  Why

14   isn't that the end of this discussion?

15        MR. KATARINCIC:  Your Honor, the issue was raised in

16   your last hearing and it was verbalized in terms of a fraud

17   being perpetrated.  I understood the spirit of it.  But the

18   cases don't require anything to rise to that level.  There's a

19   number of cases that are now trying to expand what is called a

20   sham exception.  If it is a sham, the courts have said it

21   doesn't apply.  But what is a sham.  What step does the sham

22   have to come in.  If it's a pure legislative function affecting

23   the whole community, it seems that the courts have said, sorry,

24   if they petition the legislative body to exercise their

25   legislative powers, we are not going to get into this thing.

1   Then the courts seem to bring it down to a point where it's an

2   adjudicatory type process, which affects one or a very small

3   number of people. We're not going to interfere with your

4   legislative powers. If the politicians want to pass a law, go

5   pass your law. But when it comes down to adjudication

6   affecting a very small number of people or one, then the

7   question really comes down to what did this, was this a

8   legitimate process --

9       THE COURT: Would that be, just by way of example,

10  the type of things you're talking about include a request for a

11  zoning variance?

12      MR. KATARINCIC: Involving one specific piece of

13  property it might well be. It might well be. At that point

14  they said it's more critical that we have a legitimate process

15  because the political forces of the whole community or the

16  whole state are not involved. We think that's what we have

17  here. We think the evidence will show that this should not

18  apply, we think the jury could very well find on instruction

19  that based on this evidence, there is in effect "the sham" here

20  within the process. I think I can show that. And cases are

21  making this exception, I wrote myself an extensive memo on it.

22  That seems to be the law, it makes sense.  So we think that

23  would be the answer.  We think we can prove that the exception,

24  as I've hopefully accurately defined it, will apply and the

25  jury can find yes, there is this exception.


48


1        THE COURT:  There's something called a

2  transportation plan, not confused with the ordinance itself.

3  Is it accurate to say that under the township's own

4  transportation plan, it contemplated the extension of Mandy

5  Lane someday to accommodate anticipated increased traffic flow?

6        MR. KATARINCIC:  That wasn't passed until -- that

7  map wasn't put together and made available until 2001.  And

8  their own commissioners have admitted that.  That plan is

9  simply reflective, I think, of what Diversified wanted and

10  Diversified convinced them to do.  The reason this Downs Drive

11  became interesting -- the Diversified people had the right to

12  put in a Fern Lane, which is on that property, as the real

13  access route.  They did not want to do it because they had no

14  traffic lane there.  The Zemenco group had the traffic light

15  permit for Downs Drive. The state would not permit the

16  Diversified people to put this access point in at Fern Lane.

17  Because you couldn't put a light in and, furthermore, there's a

18  light just 100 feet down the road, we're not going to put two

19  that close. What they were driven to, they had to get their

20  hands on this Mandy Lane and Downs Drive because there is a

21  left turn there. A left turn into the center at Fern Court,

22  there was no permitted left turn. This was an immense

23  advantage to Diversified. For a road with no left turn and no

24  traffic light being into the shopping center, they were now by

25  virtue of their conduct able to get Mandy Lane, Downs Drive,

49

1  into an intersection where a traffic light is permitted and

2  into a intersection with a left turn. Anybody that has these

3  hotels and shopping centers, there's only two things they worry

4  about. Do I have a left turn and do I have a traffic light.

5  That's all they worry about. And that they got tremendous

6  advantage --

7        THE COURT: They probably worry about a little bit

8  more than that.

9          MR. KATARINCIC:  I will tell you my wife won't let

10   me go down a street that doesn't have a traffic light to get

11   out, just as an example.  Excuse me for editorializing there.

12   Your Honor, I really don't have a great deal more to say except

13   I think, I've tried these cases, I think there's evidence here

14   by far to go to a jury -- the statute has not run, and that's

15   essentially a fact issue.  The Pennsylvania cases say it's an

16   objective standard.  All of these different factors have to be

17   considered by the fact finder.  I think I can establish that we

18   didn't get to know this until 2004.  On the issue of fraud, I

19   think I can show to the jury convincingly from day one before

20   the Zemenco deal was signed, they wanted to have this option of

21   Mandy Lane.  That was one of the big inducements of Scott to

22   get them to go into this.  So, therefore, he said well, put it

23   in my agreement with you, that's okay, you can talk about Mandy

24   Lane.  I think this issue is one essentially of fact, I think a

25   jury can decide it.  Even on the Noerr-Pennington, from what I

———————————————

50

1   gather, there is an underlying factual issue on whether

2   Noerr-Pennington should apply.  I guess that could be done in a

3  separate hearing of some sort with the court or jury, I'm just

4  hypothecating.

5        THE COURT:  I think the application of

6  Noerr-Pennington is a pure question of law for the court, in my

7  view.

8        MR. KATARINCIC:  Right. That's essentially all I

9  have, sir.

10        THE COURT:  I have one last thing for you.  We have

11  been focusing on the fraud claims here given the amendment.

12  But there is a breach of contract claim in the case.  Which we

13  discussed in some detail in the original argument, but I did

14  not rule on that, yea or nay.  Is it accurate to say that the

15  breach of contract claim is simply based upon the proposition

16  that article 29 does not provide for the extension of Mandy

17  Lane and, further, that the "option agreement" indicates that

18  in part Developers will do nothing to, I'm paraphrasing, damage

19  the use of Zemenco's property; is that the essence of the

20  contract claim?

21        MR. KATARINCIC:  I think that is essentially right,

22  your Honor.  That they breached the agreement and terminated

23  the contract because they say, among other things, what the

24  other things are that's lawyer language, you didn't sign the

25  reciprocal easement agreement.  We think we had a perfect

51

1  right, in their minds, what the reciprocal easement agreement

2  meant was we were going to do Mandy Lane, you've already agreed

3  to Mandy Lane.

4         THE COURT:  Would your client, this is not of record

5  but speculative maybe, but I'll ask the question anyways.

6  Would Zemenco have entered into the agreement with

7  Diversified -- I should say maybe with Scott, if up front Scott

8  had said we want a reciprocal agreement involving Mandy Lane?

9         MR. KATARINCIC:  I have never discussed that, but

10  their own document would have indicated he would not have.

11  Because it says his worst fear in the world is for us to run

12  this Mandy Lane right through the center of his property.  This

13  is in the document.  Mr. Zemenco, I doubt he would succumb and

14  ignore the worst fear in the world, I do not believe he would.

15  I have not, I don't know if there's anything of record one way

16  or the other.

17     THE COURT:  I have one last question for you and

18  this is apropos to the fraud in the inducement claim.  How can

19  it be said that Diversified could be guilty of fraud in the

20  inducement if Diversified was not a party that was negotiating

21  with you in connection with the underlying contract?

22     MR. KATARINCIC:  You asked that at the hearing you

23  had the last time.  The way I see this, I think this is the way

24  it goes, Diversified was in a conspiracy with Scott, and we

25  pled a conspiracy, we think we can prove conspiracy.  So

52

1  Diversified, through Scott, was part of the conspiracy made

2  these representations, for which Diversified as one of the

3  conspirators is jointly and severally liable.  I think that's

4  respectfully the answer to the question.

5     THE COURT:  All right, thank you.  All right, Mr.

6  Delaney.

7     MR. DELANEY:  Your Honor, I just have a couple of

8  points specifically to what was stated by my colleague.  You

9  asked about the detriment that Zemenco may have suffered as a

10  result of this taking of Mandy Lane, and Mr. Furman came up and

11    showed you where the development of Downs Drive and Mandy Lane

12    somehow disrupted the business of selling mobile homes.

13         THE COURT:  Right.

14         MR. DELANEY:  The record is unequivocally clear,

15    however, that Zemenco is not in the business and never was in

16    the business of selling mobile or prefabricated homes.  It's

17    required that one have a license to sell those types of units.

18    And the license was held by a different corporate entity.

19    Mr. Zafiropoulos was crystal clear about that in his

20    deposition.  If they're claiming lost profits or disruption of

21    business of selling mobile homes or manufactured homes, that is

22    not this plaintiff's cause.

23         THE COURT:  You're saying this plaintiff has no

24    standing to assert that claim?

25         MR. DELANEY:  No standing, no business interests --


53


1         THE COURT:  Who does, who has the license?

2         MR. DELANEY:  The licensee's name is -- I can't

3    remember, I think it was Mr. Zafiropoulos individually,

4    subsequently he transferred the license or allowed the license

5   to be transferred to his son.  It's a different name.  With

6   regard to the suggestion that the fraud -- the fraud upon the

7   township supervisors is demonstrated by Mr. Hessinger's

8   deposition transcript, there was reference made to a page 13.

9   Where he, Mr. Hessinger, was quoted as saying otherwise we

10  would never have agreed to this.  He's talking about the

11  January -- I think it's January, 1999 agreement, that

12  eliminated the obligation of Developers Diversified to improve

13  Fern Court lane.  That was a lane south, I'm sorry, north of

14  Downs Drive, that provided limited access to the property.  He

15  was not talking about the decision of the township supervisors

16  to pass a resolution taking Zemenco's property.  He does talk

17  about the decision to take Zemenco's property, and he talks

18  about it as an independent decision made by the supervisors

19  after they considered all of the options.  But it was clear

20  that Mr. Hessinger's testimony was when we made that decision,

21  we knew that DDRC was not going to be able to buy Zemenco's

22  property.  So they had the option of asking us for a taking.

23  We agreed to it, they paid for it, Developers Diversified.

24         The last point is this.  This is second motion for

25  summary judgment that we have filed.  It is the time to present

1    a prima facie case with regard to breach of contract, fraud in

2    the inducement, if that is the claim, and fraud with regard to

3    the Noerr-Pennington doctrine.  None of that information has

4    come forth from plaintiff.

5          THE COURT:  On the contract claim, though, do you

6    dispute that there are ambiguities in the contract as to what

7    is or is not permitted by way of extensions?

8          MR. DELANEY:  I don't think I can concede that.

9          THE COURT:  One would concede the term Mandy Lane is

10   not used?

11         MR. DELANEY:  It isn't.  But, judge, on the breach

12   of contract claim, the limitation of damages is the end of the

13   game for plaintiffs.  The limitation of damage clause ends the

14   cause of action.  That's where I would focus.  Assuming for

15   purposes of argument that there's an ambiguity in paragraph

16   29 --

17         THE COURT:  You mean also assuming there's no

18   independent fraud?

19         MR. DELANEY:  That's correct.

20          THE COURT:  Because if there's independent fraud,

21   even you would concede that a limitation of damages clause

22   would not have reasonably been contemplated then?

23          MR. DELANEY:  Correct, I would agree that --

24          THE COURT:  You have to resolve the other issues in

25   a sense first before you determine whether your limitation of

55

1   damages argument is correct?

2          MR. DELANEY:  If plaintiff had produced evidence of

3   a prima facie case of fraud in the inducement, then we'd be

4   talking about damage issues.  But -- there have been no damage,

5   no evidence of damage that's been brought forth on this record

6   that would support it.

7          THE COURT:  Who's on that property now?

8          MR. DELANEY:  I'm sorry, which, the 46 acres --

9   Zemenco is.

10          THE COURT:  Is your client still operating a park

11   there?

12          MR. KATARINCIC:  It's basically dying.

13          MR. DELANEY:  I would dispute that, the evidence is

14   there's been no vacancy --

15        THE COURT:  We're not going to resolve that here.

16        MR. DELANEY:  That's just not the case.

17        THE COURT:  All right, I have your point.  We'll be

18   working on this thing, thank you, gentlemen.

19

20        (Whereupon, at 10:24 a.m., the proceedings were

21   concluded.)

22

23                  - - -

24

25


                              56


1              C E R T I F I C A T E
               – – – – – – – – – –

2

3

4

5        I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11 _____

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25