IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZEMENCO, INC.,
      Plaintiff

    v.             CIVIL ACTION NO. 03-175 ERIE

DEVELOPERS DIVERSIFIED,
      Defendant


STATUS CONFERENCE


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, December 15, 2004.


APPEARANCES:
      ERIC P. REIF, Esquire, (via Phone), appearing on
      behalf of the Plaintiff.

      W. PATRICK DELANEY, Esquire, appearing on behalf
      of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

```
1              P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 9:00 a.m., on

4    Wednesday, December 15, 2004, in Judge's Chambers.)

5

6          THE COURT:  All right, counsel, I don't care which

7    one of you starts to fill me in, what's going on here that you

8    needed me to get involved?

9          MR. DELANEY:  Judge, this is a case where you issued

10   an amended case management order back in September that called

11   for dispositive motions to be resolved, I think, by early

12   December or to be filed by early December.

13          MR. REIF:  On November 20th.
```

14          THE COURT:  Was that the first filing deadline for

15    dispositive motions, November 20th?

16          MR. REIF:  That is correct.

17          MR. DELANEY:  I think Mr. Reif's pretrial as the

18    plaintiff was due on the 10th of December.  There's been a

19    development that I thought made sense to talk with you about.

20    That is that this case revolves around the disposition of a

21    piece of property on upper Peach --

22          THE COURT:  Mandy Lane.

23          MR. DELANEY:  Right.  Zemenco has now gone to state

24    court and has asked for a Board of Viewers under the original

25    condemnation action that was instituted -- I think in 2000,


                               3


1    Eric?

2          MR. REIF:  I believe that's right.

3          MR. DELANEY:  I was not the lawyer with that, but I

4    believe that's the correct date.  They have the right to do

5    that, I didn't know that, for up to six years.

6          THE COURT:  I thought that state thing was over?

7          MR. DELANEY:  I did, too, until this all happened.

8   But they're ripe for up to six years after the government pays

9   you, you can ask for a Board of Viewers saying you want more

10   money.  Well, they've done that.

11        THE COURT:  How much were you paid, Mr. Reif?

12        MR. REIF:  The initial payment, your Honor, was

13   $287,000.

14        THE COURT:  That's hardly a drop in the bucket,

15   right?

16        MR. REIF:  Well, that's correct.  But your Honor

17   knows how valuable that property is in this corridor.

18        THE COURT:  His Honor has never seen it.  I'll take

19   your word for it.

20        MR. REIF:  I simply mean the remaining property with

21   all the development, this 46-acre parcel which borders Peach

22   Street and I-90.  It's one of the last remaining undeveloped

23   tracts in that area.

24        THE COURT:  I was being facetious, I know the

25   general area of what you're talking about up there.  But, in

4

1   any event, let's get back to the Board of Viewers.

2          MR. DELANEY:  The Board of Viewers is supposed to

3    meet and examine the property today.  But I wonder whether

4    they'll actually do that.

5          THE COURT:  What do they do, what's their charge?

6          MR. DELANEY:  They're to look at the property and

7    declare what the value of the loss to Zemenco was, I believe,

8    and Mr. Reif can correct me.

9          MR. REIF:  Your Honor, the process is, and I am not

10   an expert with regard to Board of Views.  One of my partners,

11   Tony Basinski, is handling that aspect of the case.

12          THE COURT:  Is he there?

13          MR. REIF:  He is not.  He's actually up for the

14   viewing today, it's my understanding that's going forward.

15          THE COURT:  Armed with what little knowledge you

16   might have about the Board of Viewers, tell me what your

17   understanding is?

18          MR. REIF:  I certainly understand the procedure.

19   Your Honor, the difference between the District Court case and

20   the Board of View proceeding is that, one, what happened in

21   this case is when the property was condemned initially, what

22   Summit Township did, based upon the appraisal Pat had obtained

23   from an appraiser by the name of Sammartino, simply volunteered

24  the amount contained in his report as an appraisal value for

25  the 46 acres that had been condemned as part of this Mandy Lane

5

1  road construction.

2          THE COURT:  Is that the $250,000 or whatever?

3          MR. REIF:  $287,000.  Under the statute that

4  pertains to these actions, Mr. Delaney is correct, there is

5  then a fairly long period of time to challenge that as being

6  adequate or accurate, and the way that is done is to request

7  that the Board of View be appointed.  Now, the procedure is

8  that the Board of View, which has been appointed to inspect the

9  property, and then the Board of View actually conducts a

10  hearing at which expert testimony is presented.  At that

11  hearing Mr. Zafiropoulos himself, the owner, could testify.

12  But traditionally that's done on the basis of expert testimony.

13  And we certainly plan on proceeding with an expert.  Now, the

14  Board of View makes an award and the parties can either -- the

15  challenging party can either accept that amount or there is the

16  right to appeal that and actually have a full-blown jury trial

17  in the Court of Common Pleas where the whole valuation issue is

18  addressed again.

19         THE COURT:  And then on to the Commonwealth Court, I

20  presume?

21         MR. REIF:  Yes, that could occur.  That is the

22  procedure.  Now, the distinction here is that with regard to

23  the condemnation or Board of View proceeding, the entire issue

24  is the fair market value of the entire property, not just half

25  an acre, but the entire tract immediately before the taking and

6

1  unaffected by the prospect of the taking.  And the fair market

2  value of the remaining property immediately after the taking.

3  And the distinction between those damage issues and the damage

4  issues in this case are that here in the District Court, for

5  example --

6         THE COURT:  I understand the distinction, Mr. Reif,

7  I know exactly what's going on in District Court.  I appreciate

8  what you've educated me on so far which I needed.  But, as I

9  understand it, what's going on here is you had a bargain

10  hammered out for what you thought was around $3.8 million or

11  $3.9 million.  Developers, then, I guess you concluded that

12   they were in material breach, is that right?

13        MR. DELANEY:  Yes, and terminated --

14        THE COURT:  And terminated the agreement.  Here's my

15   question to first Mr. Reif.  Regardless of how this shakes out

16   in the Board of Viewers, and let's assume that the Board of

17   Viewers ultimately awards some dough that is in excess of what

18   Mr. Sammartino awarded --

19        MR. REIF:  Yes.

20        THE COURT:  That, of course, that's not on a

21   parallel track to this.  Would that serve as some type of

22   offset for your damages in federal court?

23        MR. REIF:  Your Honor, I don't believe it would be

24   an offset.  But my suggestion is this, and Mr. Delaney and I

25   have discussed this.  His thought was, well, why don't we


                              7


1    simply stay the District Court action because depending upon

2    what the Board of Viewers does, that may help resolve all of

3    the litigation.  And, your Honor, it's important to realize

4    here, and I don't know if your Honor is aware of this fact, but

5    because of an agreement entered into by Developers Diversified

6   and Summit Township during the development of the Peach Street

7   Square shopping center and the actions relating to the

8   condemnation and the Mandy Lane portion of property that

9   Developers wanted condemned, they have entered into an

10  indemnification agreement with Summit Township.  So, for

11  example, Developers paid the $287,000.  They are also on the

12  hook for any attorney's fees or any additional payments made as

13  part of this Board of Viewer proceeding.  So all of the money,

14  to the extent that any money is forthcoming in either the

15  District Court action or the Board of View proceeding, will

16  come from Developers.  And my thought there was this.  The

17  damage issues are distinct.  But it seems to me that perhaps

18  this would make sense, and this is just a suggestion that I

19  have.

20      THE COURT:  All right.

21      MR. REIF:  In the District Court action we would

22  proceed to, at least I file our pretrial statement, which would

23  define the damage issues before your Honor.  And then agree to

24  stay the action at least until the Board of Viewers has reached

25  a conclusion.  Perhaps with whatever amount of money is

1  involved in that, then through your Honor or a third-party

2  maybe, we could sit down and try to mediate or conciliate this

3  to see if we could wrap up everything.

4          THE COURT:  All right, let's go off the record right

5  here.

6          (Discussion held off the record.)

7          THE COURT:  Back on the record.  Go ahead.

8          MR. DELANEY:  I was just saying off the record that

9  I found the case confusing because I don't see the distinction

10  between the claims in District Court and the claims in the

11  condemnation proceeding.

12          THE COURT:  Let's do it this way.  Let's roll it all

13  the way back.  First of all, tell me, articulate for me what

14  you think the nature of the claim is before me, and then tell

15  me what you think the nature of the claim is there and why they

16  are not distinct?

17          MR. DELANEY:  All right.  It was my view that the

18  plaintiff had pled and seem to respond to discovery by

19  indicating that the plaintiff had two causes of action or two

20  theories of recovery.  One as a breach of contract -- you

21  terminated this $3.9 million contract to buy my property, and

22  you did it improperly and I want the benefit of the bargain.

23  Now, the difficulty with that is that the contract that was

24  supposedly breached by my client when they declared the

25  termination contains a limitation of damage clause that says if

9

1  we breach, you get the amount of money that is sitting in

2  escrow, which I think is $20,000.  And that's the limitation on

3  your damages.  And then I thought, well, they've made other

4  allegations here --

5      THE COURT:  Contract?

6      MR. DELANEY:  It relates to contract.  But it's

7  essentially a fraud in inducement.  You entered into this

8  contract never intending to perform.  Trying to dupe us into

9  giving an easement for Mandy Lane, and when that failed, you

10  went to Summit Township and convinced them to condemn the

11  property and you now owe us damages.

12      THE COURT:  Which purely is a legal matter if true,

13  would nullify the effect of that limitation of damages clause?

14      MR. DELANEY:  It does.  But then you have two

15  problems.  One, the Third Circuit recognizes and the Supreme

16  Court recognizes a privilege for any person or entity

17  petitioning government for any reason.  We've pled that.

18      THE COURT:  First Amendment?

19      MR. DELANEY:  Essentially.  Akin to the

20  Noerr-Pennington privilege in an antitrust case.  Secondly, if
    _____

21  there's a fraud inducement, if the grand conspiracy failed,

22  what have they lost.  They've lost the property that's been

23  condemned.  The value of which is going to be established by

24  the Board of Viewers.  And that seems to be almost a collateral

25  estoppel.  So when Mr. Reif and I began talking about


                                    10


1  scheduling, I said, well, I really do need to file this

2  dispositive motion, I want to file a dispositive motion on my

3  privilege issue under Noerr-Pennington on fraud of inducement.
                _____

4  I want to file a dispositive motion on limitation of damages if

5  you're claiming a breach of contract.  I have asked Mr. Reif in

6  the past what are the damages, what damages are different here

7  than what you're claiming in the condemnation proceeding.  And

8  he has consistently indicated that they are different, but I

9  don't know what they are.

10      MR. REIF:  Your Honor, let's address that issue

11  briefly, if I may.  First of all, with regard to dispositive

12  motions, we have a pretrial order that required any such

13  motions be filed by the 20th.  And Mr. Delaney in discussions,

14  and I have made it clear to him and included it in a letter,

15  that we were not agreeing to waive any deadline.  Moreover,

16  with regard to the dispositive motions, and we can view the

17  facts differently, I think that in terms of what I understand

18  the applicable law to be, Developers has a problem in the sense

19  that several months ago I served them with 30 or 35 requests

20  for admissions.  That for some reason they overlooked or missed

21  the deadline and they have never been answered.  So with regard

22  to the dispositive motion issue, I think we can clear that

23  hurdle.

24      But more importantly, your Honor, with regard to

25  what is distinct in the damage claims, even if you simply look

11

1  at our complaint, we are entitled to recover any damages that

2  naturally would flow from the breach.  It's not simply the loss

3  of the benefit of the bargain.  To cite two or three examples.

4  Categories of damage that are entirely different -- addressed

5  the Board of View proceeding, are things such as continued debt

6  service on the property.  The condemnation of that particular

7  parcel of land.  The effect also of eliminating the sales bond,

8  that Zemenco had to display these manufactured housing models

9  which get sold as part of its development on the property.  And

10  at the time the condemnation occurred there were 36 or 39 units

11  in place.  The plan for that property called for as many as in

12  excess of 150 units all together and the land is there.  But

13  the number of experts that deal with the development of these

14  types of properties will tell you that it is absolutely

15  essential to have a sales lot on-site to develop those

16  manufactured housing developments properly and successfully.

17  So that wiped out that ability and that creates a category of

18  damages where you have, among other things, lost rentals that

19  would be achieved or reasonably could be achieved by having

20  additional units in place.

21        The other thing that happened, your Honor, is that

22  because Zemenco's development of the property was stopped dead

23  in its tracks when the property was condemned and no closing

24  occurred, the rentals -- the rental payments that are

25  generated, monthly rentals by having 36 to 39 units, is not


                                    12


1   adequate to service the debt on the property or has not been

2   adequate.  So what has happened to Zemenco since the

3   declaration of default was declared in 1999 by Developers, is

4   at the time, and Mr. Delaney has these numbers because Mr.

5   Zafiropoulos testified to them when he was deposed, at the time

6   the total debt on the property, as I recall, was something in

7   the range of $800,000.  Today it's $1.8 million.  And Zemenco

8   simply had to obtain additional moneys and additional loans to

9   try to hold on to the property.

10      THE COURT:  On this subject of limitation of damages

11  provision in this contract, what do you make of that?

12      MR. REIF:  Your Honor, I do not think under the

13  circumstances in this case and this argument is greatly

14  bolstered I think by the admissions we have, by their failure

15  to respond to the request for admissions, but I recognize that

16  the general case law is that those clauses are generally

17  enforceable.  But there is a line of case law, I can't cite the

18  cases to you off the top of my head, that basically stand for

19  the proposition that these liquidated damage provisions however

20  are not enforceable if the liquidated damage amount is grossly

21  out of proportion to the damages.

22       THE COURT:  Let me interrupt you for just one

23  second, so I make sure I'm tracking you.  Is this a truly

24  liquidated damage provision or limitation of damage clause?

25       MR. DELANEY:  It's a limitation of damage clause.


                              13


1  It contains the words liquidated, but it's a limitation of

2  damage clause.

3       THE COURT:  I'm sorry, Mr. Reif, go ahead.

4       MR. REIF:  But there is a line of case law that

5  stands for the proposition that those clauses, of course, have

6  to be looked at in each of, each individual factual setting.

7  To over generalize, these are not enforceable in the

8  limitation, not only to the proportion of damages that may be

9  incurred by the party that supposedly is subject to these and

10  the breaching party is well aware of that, when the breach

11  occurs.

12          Now, in this case, your Honor, the whole reason for

13   the declaration of the default was the claim by Developers that

14   Zemenco had an absolute obligation to agree to the extension of

15   both Downs Drive and Mandy Lane.  There is absolutely no

16   reference in his agreement to Mandy Lane.  And the fact of the

17   matter is Developers negotiated both the agreement with Nick

18   Scott that refers to Mandy Lane and, also, based upon their

19   testimony, when we deposed their corporate representatives in

20   Ohio, conceded that they played a role in drafting the

21   Scott-Zemenco agreement, and knew exactly what language was in

22   there.  Now, their only explanation is, well, he should have

23   known that because the applicable paragraph also talks to road

24   development in conformance with the Summit Township

25   transportation plan.  Well, more recently, your Honor, we


                              14


1   deposed Mr. Sterrett, who's the engineer --

2          THE COURT:  If I could interrupt you just a second,

3   Mr. Reif.  I'm flipping through the complaint as you're talking

4   to me, there is a specific reference in the agreement to Mandy

5   Lane.  It says Developers agrees to construct --

6          MR. REIF:  Bear with me, just a minute, your Honor.

7          THE COURT:  Paragraph 13 of the complaint.  Then I

8    want to ask you a question.  Indented paragraphs seven and

9    eight, paragraph 12 of the complaint.

10          MR. REIF:  What that is referring to, your Honor, is

11    the language in the January 11, 1999 development agreement

12    which Summit entered into or, I'm sorry, Developers entered

13    into with Summit Township.  That is not our agreement.

14          THE COURT:  All right.  Let me ask a question about

15    this.  Is there anything in your agreement that -- is there

16    anything in your agreement that references either directly or

17    by implication this Mandy Lane business?

18          MR. REIF:  It's our position, your Honor, it does

19    not.  Because, first of all, Mandy Lane is not referenced

20    anywhere.  Secondly, with regard to the transportation plan,

21    the fact of the matter is nobody could ever figure out what

22    that transportation plan provides, based upon Mr. Sterrett's

23    deposition.

24          THE COURT:  Mr. Reif, hold your thought one second.

25    Off the record.

1        (Off the Record.)

2        THE COURT:  Go ahead.

3        MR. REIF:  What I was going to explain to you very

4   simply is that we recently had the depositions of the township

5   people who were represented by Mr. Sennett.  The transportation

6   plan doesn't even --

7        THE COURT:  What's the transportation plan?

8        MR. REIF:  Summit Township has a transportation

9   plan, a basic transportation plan for the development of its

10  road system.  In connection with the development of the Peach

11  Street Square shopping center, certain amendments, at the

12  request of Developers, were made, for example, to the

13  transportation plan.  And the transportation plan doesn't

14  really name any street at all.  So there's no way that you can

15  tell in looking at it where the given proposed street would be.

16  Moreover, with regard to the development of the Peach Street

17  Square shopping center, several roads, including what

18  eventually ended up being Mandy Lane, were not only relocated

19  but renamed.

20        Now, Developers has referenced from time to time --

21  I'm sorry, I don't have this exhibit in front of me, an

22  ordinance which was enacted at one point at Developers request

23  in connection with the whole Mandy Lane situation.  Well, the

24  fact of the matter is the effect of that ordinance was not

25  reflected in the revised transportation plan until three years


                                    16


1  after the fact, and after all these events had occurred.  The

2  declared default and everything else.  And also with any notice

3  for any amendment to the transportation plan that does not go

4  to the individual property owners, like a Zemenco or

5  Zafiropoulos, it's simply published and will simply state that

6  the township proposes or is proposing, among other things, an

7  amendment to its transportation plan without identifying what

8  that amendment is.

9          MR. DELANEY:  May I interrupt just a moment.  We do

10  have a difference as to why, whether Mr. Zafiropoulos, Zemenco

11  knew when they entered into the agreement, their intent to

12  connect Mandy Lane to Downs Drive.  Who cares.  I mean for

13  purposes of argument, let's assume that he never contemplated

14  it.  We got to go back to paragraph 20 of the agreement, which

15  is attached to the complaint.  Which says under (a), if

16  purchaser --

17         THE COURT:  Nick Scott?

18         MR. DELANEY:  Was originally Nick Scott or his

19  assignee.  If purchaser defaults, you get to keep deposit.

20  There's no other recourse.  Now, someone had typed in here

21  thinking there are liquidated damages, an issue where you can

22  get some curious results.

23         THE COURT:  Unfair results sometimes.

24         MR. DELANEY:  Unfair results.  But those unfair

25  results are typically when --


                              17


1          THE COURT:  A defaulting party gets named.

2          MR. DELANEY:  A defaulting party gets named for

3  paying for more than what is the real damage.  I would submit

4  what we do is file dispositive motions, argue this.  Look,

5  there isn't a liquidation clause, it's a limitation of damage

6  clause.  And in that particular case they are not disfavored by

7  the courts, limitation of damage clauses are generally upheld.

8  They're not given the same scrutiny as liquidated damage

9   clauses are and this is enforceable.

10          MR. REIF:  This is not a situation where Developers

11  took the position that we defaulted.  They declared a default

12  by my client.

13          MR. DELANEY:  Let me just respond to that.  The

14  letter says that this is terminated for -- among the reasons

15  for which it is terminated, which you've defaulted.  But it's a

16  termination.

17          THE COURT:  Let me say this, I want to ask some more

18  general questions, but I appreciate this background.  This is

19  kind of like the old story about the guy with a bandana across

20  his eyes feeling the legs of an elephant trying to figure out

21  what he's dealing with.  I'm touching every tree in the forest,

22  I'm not above it yet so I can get the picture.  Let me now try

23  to do that.  In terms of, I am always instinctively reluctant

24  to stay a case unless I know that there are good prudential

25  reasons to do it, and that nothing in the meantime can be


18


1   occurring here that materially advances my case, either by way

2   of full or partial disposition, that's the first question for

3    you.  And let me just say this.  Instinctively, particularly

4    given this long winding road of condemnation, I am unwilling to

5    stay this case.  I think I'm unwilling to stay this case, if

6    someone can suggest to me that something productive can go on

7    here even while that thing is going on here.  Here's my

8    question.  And the question of timeframes came up.  Well, I'm

9    in charge of timeframes.  When people file things and I take a

10   more pragmatic approach to it, my question is this.  Would

11   either of you, I think I've heard from Mr. Delaney -- Mr. Reif,

12   would it be your intention, if given the opportunity, on behalf

13   of your client to file either a full or partial summary

14   judgment motion with me?

15        MR. REIF:  Would it be my intention to do that, your

16   Honor?

17        THE COURT:  Yes, sir.

18        MR. REIF:  No, your Honor.  What we had planned on

19   doing and, again, my thought would be, our thought would be to

20   file our pretrial statement, to file an expert's report that

21   would elucidate these damage issues that we've been talking

22   about.  My suggestion, which I think would be practical in

23   terms of moving this case forward, would be that Mr. Delaney do

24   the same thing.  At that point we should have at least the

25  initial decision from the Board of View in the next few months.


19


1  And depending on what that is, my thought, just from a

2  pragmatic standpoint, since Developers, whatever the tab is

3  going to be, is going to be paying it.

4       THE COURT:  By the way, their indemnity agreement

5  requires you to pay the freight, not only the legal fees, but

6  also will require you to pay any judgment, if you will, that

7  the Board of Viewers enters?

8       MR. DELANEY:  My understanding is, I'm not a party,

9  I'm not privy to that agreement, I didn't negotiate it, I don't

10  represent DDR on that aspect.  But Tim Sennett is representing

11  the township.  I have the impression that if the Board of

12  Viewers were to come back and say, well, you know, it's

13  $387,000, DDR is going to pay the 100, they're going to

14  reimburse Summit Township for Tim Sennett's work.

15       THE COURT:  Where does that leave us, we're only

16  about $3.5 million short?

17       MR. REIF:  My thought is, your Honor, perhaps at

18  that point, which is a few months down the road, then we could

19  sit down and revisit these issues and see if there is anyway we

20  can resolve everything.  If we can't --

21      THE COURT:  I'm not disparaging the approach out of

22  the box, but it doesn't strike me as productive or practical,

23  and I'll tell you why.  Let me come back to this question about

24  summary judgment motions.  If you're right on your liquidated

25  damage clause, then that's the end of the ball game, isn't it?


                                    20


1       MR. DELANEY:  Unless they provide a fraud

2   inducement -- convince you there is a privilege there.

3       THE COURT:  Trims the sails off the case somewhat.

4   I'm not suggesting you are, but if you are right, doesn't that

5   reconfigure this case somewhat, wouldn't that even be --

6   whether he's successful or not, either way, isn't that an

7   inducement at that point to further settlement discussions?

8       MR. DELANEY:  Yes, it is from my standpoint.

9       THE COURT:  What do you think, Mr. Reif, from this

10  standpoint of moving my case, I'm not getting much out of this,

11  it seems to me.  It is unlikely, and you can correct me, either

12  of you if I'm wrong, but it is unlikely the Board of Viewers

13  conclusion is going to be astronomically higher than what

14  Sammartino already did.  So all you're going to end up with, if

15  it's not appealed, is another 100 or 200 grand in your pocket,

16  at which point the lay of the land will be precisely the same

17  way it is before me right now, except there would have been no

18  motion practice and nothing would have happened over here.

19  Now, let's go off the record here.

20       (Discussion held off the record.)

21       THE COURT:  Look it, I'm looking at the amended case

22  management order.  So discovery closed on October 31st it looks

23  like?

24       MR. REIF:  That's correct.

25       THE COURT:  Did you complete your discovery, Pat,


21


1  essentially?

2       MR. DELANEY:  We did.  We went beyond that deadline,

3  but we got it done.

4       THE COURT:  So discovery is done.

5       MR. REIF:  Again, your Honor, the only thing I would

6  say, for what it's worth, that of course from client's

7    standpoint, there is no question at trial Mr. Delaney could

8    file a motion for a directed verdict, that type of thing.  I

9    think it's certainly prejudicial to have gone by that November

10   20th deadline and now talk about Developers filing a motion for

11   summary judgment.

12          MR. DELANEY:  Judge, it absolutely is not

13   prejudicial to them.  If you adjust the schedule, there's

14   nothing that's happened in the interim.  The plaintiff's have

15   known of these defenses from the outset.

16          MR. REIF:  There is no question about that, I'm

17   simply saying, your Honor, if the deadline is upheld, that I

18   get to a jury if the case is not settled.

19          THE COURT:  Well, if that deadline is not upheld and

20   they lose their summary judgment motion, you still get to a

21   jury, it seems to me.  Look it, this is what I'm going to do.

22   I take it implicitly that what the defendant is asking for is

23   an extension of time on the pretrial schedule?

24          MR. DELANEY:  Right.

25          THE COURT:  I'm inclined to grant that.  But I'm not

22

1   inclined to grant much.  Now, we're right smack in the holiday

2   period.  You file, if you're going to do it -- your motion and

3   supporting brief in 30 days.  And then, Mr. Reif, you've got 30

4   days, it's more than I normally give, he's got 30 days to move,

5   I'm going to give you 30 days to respond to any motion.  I'm

6   not even going to order the timing on the filing of pretrials

7   right now, it's premature, I'll just wait and see what happens.

8   I'm not going to get an order out on that, frankly, because

9   it's one less logistical thing, I'm without my deputy clerk

10   right now.  All right, let's go off the record.

11          (Discussion held off the record.)

12

13          (Whereupon, at 9:45 a.m., the proceedings were

14   concluded.)

15

16

17                    - - -

18

19

20

21

22

23

24

25

23

1           C E R T I F I C A T E

2

3

4       I, Ronald J. Bench, certify that the foregoing is a

5   correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10  _____

11  Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25